CRAWFORD, P.J., W.S., and HEWITT P. TOMLIN, Jr., Senior Judge, concur.

**Robin Gail HERRERA, Plaintiff/Appellee,**

v.

**Fernando Antonio HERRERA, Defendant/Appellant.**

Court of Appeals of Tennessee, Western Section, at Jackson.

Oct. 14, 1996.

Application for Permission to Appeal Denied by Supreme Court April 7, 1997.

Stevan L. Black, Black, Bobango & Morgan, Memphis, for Defendant/Appellant.

David E. Caywood, Marc E. Reisman, Causey, Caywood, Taylor & McManus, Memphis, for Plaintiff/Appellee.

FARMER, Judge.

In this divorce action, Fernando Antonio Herrera (hereinafter "Husband" or "Dr.

Herrera") appeals the trial court's determination regarding the award of custody of the parties' minor children as well as the amount of child support, rehabilitative alimony, marital debt and attorney's fees for which Dr. Herrera was held responsible. In addition, he also appeals the Chancellor's reliance upon the Guardian Ad Litem's report and recommendations, the Chancellor's refusal to disqualify himself from presiding over the contempt proceedings against Dr. Herrera and the trial court's finding that Dr. Herrera was guilty of criminal contempt.

## FACTS

Fernando Antonio Herrera and Robin Gayle Prater Herrera (hereinafter "Wife" or "Mrs. Herrera"), were married in November 1984. From this union, two children were born, Robin Evan Herrera in January 1986 and Alexander Prater Herrera in February 1988. Dr. Herrera is a thoracic and cardiovascular surgeon in private practice in Memphis. Evidence introduced at trial indicated that Husband has earned in the past income approaching $1 million. However, his income has been reduced in recent years due to a reduction in the Medicare reimbursements and a decline in physician referrals. On May 13, 1993, Dr. Herrera filed for bankruptcy.

Mrs. Herrera was trained as a registered nurse and practiced from 1978 until 1983. In 1984, she worked for a short time as a real estate broker and from February 1985 until December 1985 she worked in Dr. Herrera's office in the collections area. From December 1985 until the initiation of the divorce proceedings, Mrs. Herrera was not employed outside the home. However, after instituting the divorce she began working in the mortgage banking business. It is undisputed that Mrs. Herrera was the primary care giver to the parties' two children. In addition, she was active in both civic and social affairs, including the Medical Society Auxiliary and the Heart Gala. Many of these activities, including the Heart Gala, were an effort to build Dr. Herrera's practice by increasing referrals which are the basis of his practice.

Dr. Herrera had four children from a prior marriage, and he paid a total of $5,200 per month to his ex-wife which was unallocated between alimony and child support. The three oldest children reached the age of majority prior to the hearing of this cause, and the youngest child, Andrew Herrera, lived with his father at the time of the proceedings. It was revealed at trial that Dr. Herrera's ex-wife was paying his attorneys' fees in the instant proceedings.

The final decree of divorce was entered on January 24, 1994. The trial court awarded custody of the parties' minor children to Mrs. Herrera and gave Dr. Herrera liberal visitation privileges. The trial court ordered Dr. Herrera to pay $3,500 per month as child support and to maintain both a health insurance policy for the children and a $1 million life insurance policy until the youngest child reached the age of majority. In addition, he was ordered to pay private school tuition for the children at Presbyterian Day School in Memphis. Wife was awarded the parties' two homes located at 2891 Central Avenue and 2900 Central Avenue both in Memphis, Tennessee. In addition, Wife assumed all debts outstanding on the property. Husband was awarded all other real property owned by the couple including their Mississippi farm, Florida condominium and an unimproved lot located in Shelby County. Costs were adjudged against Husband. Dr. Herrera was ordered to pay all debts of the parties which had not otherwise been distributed. The trial court also ordered Dr. Herrera to pay $2,500 per month to Mrs. Herrera as rehabilitative alimony for sixty months and to pay all her attorneys' fees, expenses and costs associated in this cause which totaled $101,916.51. Such sum was to be payable at the rate of $2,000 per month at 5% interest. Because of the contemporaneous bankruptcy proceeding, the chancery court ordered that, except for the property transfers, all amounts to be paid were to be considered for the maintenance and support of the plaintiff and the parties' minor children and were, therefore, non-dischargeable in bankruptcy, by application of *In re Calhoun*, 715 F.2d 1103 (6th Cir.1983).

On February 8, 1994, Wife filed a petition for *scire facias* because of Dr. Herrera's failure to pay his support obligations. Dr.

Herrera missed two court appearances on Wife's petition, and the Chancellor issued an "Order of Attachment Pro Corpus." Husband filed a motion to disqualify the Chancellor from presiding over the contempt proceedings. The motion was denied. The trial court found defendant guilty of criminal contempt because of willful nonpayment of his support obligations due on February 1, February 15, March 1 and March 15, 1994. The Chancellor determined that Husband owed Wife $5,700 in support obligations and an additional $5,478.25 in legal expenses. In addition, the Chancellor ordered Husband to be incarcerated for a period of six (6) months to be served in 24-hour monthly increments.

## ISSUES ON APPEAL

I. Did the Chancellor err in admitting into evidence and considering the Guardian Ad Litem's report and recommendation?

II. Did the Chancellor err in awarding custody of the parties' two minor children to Ms. Herrera?

III. Did the Chancellor err in finding Dr. Herrera underemployed, and as a result, erred in setting the amount of child support?

IV. Did the Chancellor err in setting the amount of alimony, including: (a) awarding an excessive amount of rehabilitative alimony to Ms. Herrera; (b) classifying the marital debt as alimony and requiring Dr. Herrera to pay virtually all of it; and (c) awarding Ms. Herrera virtually all of her attorney fees totaling $101,916.51?

V. Did the Chancellor err in refusing to disqualify himself from presiding over the contempt proceeding against Dr. Herrera?

VI. Did the Chancellor err in finding Dr. Herrera guilty of criminal contempt; or in the alternative, did the Chancellor impose an excessive punishment?

## GUARDIAN AD LITEM

The trial court appointed Lesley Gattis Coleman as Guardian Ad Litem to protect the interests of the minor children. Pursuant to her duties, Ms. Coleman conducted interviews of the parties and children, their friends, colleagues, employees and teachers as well as two psychologists who had interviewed the children and Dr. and Mrs. Herrera. Coleman's findings and recommendations were incorporated into the "Report of the Guardian Ad Litem." Specifically, the Guardian Ad Litem recommended that primary custody be given to Mrs. Herrera with liberal visitation to be given to Dr. Herrera. The Chancellor ultimately adopted, *inter alia,* the findings and recommendations of the Guardian Ad Litem, over the Husband's objections.

Dr. Herrera asserts that the Chancellor erred in admitting into evidence and considering the Guardian Ad Litem's report because the report contained inadmissible hearsay under Rule 802 of the Tennessee Rules of Evidence. Furthermore, by adopting the Guardian Ad Litem's findings, Dr. Herrera asserts that the Chancellor exceeded the scope of the Guardian Ad Litem's appointment. The Guardian Ad Litem's report contained statements made by Dr. Elizabeth Harris, Dr. Robert Burkhalter and the Guardian herself. Dr. Herrera asserts that such statements were made out of court and were offered at trial as the truth. As such, the statements are inadmissible hearsay that do not fall within any of the exceptions to the hearsay rule found in Rules 803 and 804, T.R.E. Dr. Herrera asserts that for the Chancellor to conclusively adopt the unsworn report of the Guardian Ad Litem constitutes reversible error.

■ Assuming, *arguendo,* that Dr. Herrera is correct and that the report of the Guardian Ad Litem contains inadmissible hearsay, we conclude that the admission of the Guardian Ad Litem's report, was, at the most, non-reversible error. *See* Rule 36(b) T.R.A.P. The transcript of the divorce proceedings clearly indicates that the trial court did not rely entirely upon the Guardian Ad Litem's report. As the trial court noted during the divorce hearing:

As to the issue of custody, the Court will adopt the findings and recommendations of the Guardian Ad Litem after carefully considering not only that proof as presented ... through her report *and the proof of*

*this cause and having interviewed the children.* (Emphasis added.)

The record is replete with evidence introduced by both parties as it relates to the comparative fitness of each parent to be the custodial parent. In addition, the Chancellor interviewed the children as requested by Dr. Herrera. As noted by the trial court when making its findings of fact:

The Court further finds that the other reasons for the necessity of the granting of that custody. . . .

The Court does find that Dr. Herrera is an intimidating, aggressive, volatile, have his own way kind of person. . . .

Therefore, since the trial court expressly considered evidence in addition to the Guardian's recommendations, it appears to the Court that any error that may have been committed by the trial court in considering the Guardian's recommendations was harmless and does not merit reversal of the trial court's decision. *McKeehan v. McKeehan,* No. 02A01–9407–CV–00165, 1995 WL 695124 (Nov. 21, 1995).

## *CUSTODY*

Dr. Herrera asserts that the Chancellor was in error in awarding custody of the parties' two children to Wife. Specifically, he asserts that the Chancellor conclusively relied upon the report and recommendations of the Guardian Ad Litem and that the Chancellor abused his discretion in weighing the evidence presented at trial. In essence, Dr. Herrera asserts that he would be the better custodial parent.

■ In order to make a determination concerning the custody of children, the trial court must look to the particular facts of each case. *Scarbrough v. Scarbrough,* 752 S.W.2d 94, 96 (Tenn.App.1988). Factors to consider include, but are not limited to the following:

[A]ge, habits, mental and emotional make-up of the child and those parties competing for custody; the education and experience of those seeking to raise the child; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking custody and the special requirements of the child; the availability and extent of third party support; the associations and influences to which the child is most likely to be exposed [and] the alternatives afforded, both positive and negative; and where is the greater likelihood of an environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nurture.

*Bah v. Bah,* 668 S.W.2d 663, 666 (Tenn.App. 1983).

■ During the course of these proceedings, the trial court had an opportunity to observe personalities, responsibilities, demeanor, credibility, and suitability of each parent to serve as the custodial parent. Mrs. Herrera was the parent who, on a day-to-day basis, took care of the children throughout their young lives. She had spent as much as eight to ten hours per day with the children attending to their physical needs such as waking them, bathing them, dressing them and buying their clothes. In addition, Mrs. Herrera also took the children to the zoo, circus, museums as well as accompanied them on vacations and birthday parties. She played with them, read to them and became involved with their school activities and their school work.

■ The trial court concluded that Dr. Herrera was an "intimidating, aggressive, volatile, have his own way kind of person." The Chancellor also found that Mrs. Herrera was not "the complete opposite of all these things" and that neither Dr. Herrera nor Mrs. Herrera was as good a parent as he or she should have been. Nevertheless, this Court is of the opinion that the findings of the trial court should be given great weight as they relate to issues surrounding child custody. "Absent some compelling reason otherwise, considerable weight must be given to the judgment of the Trial Court [in a divorce proceeding] in respect to credibility and suitability" of the parties as custodians. *Bush v. Bush,* 684 S.W.2d 89, 95 (Tenn.App. 1984). The trial courts are vested with a wide discretion in matters of child custody, and the reviewing courts will not interfere except upon a showing of erroneous exercise

of that discretion. *Grant v. Grant*, 39 Tenn. App. 539, 286 S.W.2d 349, 350 (1954). The trial court enjoys a substantial advantage in having the opportunity to see, hear and evaluate the parents suitability as custodians. *Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn.App.1989). As this Court noted in *Bah v. Bah*, 668 S.W.2d 663:

> [T]his Court will, however, give great weight to the decision of the trial court because the judge saw the witnesses face to face and heard them testify; this rule being based upon the assumption that the trial judge did not act arbitrarily or willfully but with the regard to what is right and equitable, *considering first the child's best interest as directed by his reason and conscience towards the child's welfare.*

*Bah*, 668 S.W.2d at 665 (quoting, *Riddick v. Riddick*, 497 S.W.2d 740 (Tenn.App.1973)).

▪ The true test for the award of custody is to arrive at the point of deciding with whom to place the child in preparation for a caring and productive adult life. *Bah* at 665–66. It is noted by this Court in *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn.App.1993), that the welfare and best interest of the children are of paramount concern in custody cases. *See also, Mollish v. Mollish*, 494 S.W.2d 145, 151 (Tenn.App.1972). Fitness for custodial responsibilities is a comparative matter that the trial court is required to make. *See Bah v. Bah*, 668 S.W.2d at 666. Nowhere is the presumption of correctness of the trial court's conclusions more applicable than in matters of child custody where the surrounding testimony is complex and involved and frequently filled with disputes and acrimony. *See Nicks v. Nicks*, 51 Tenn. App. 520, 369 S.W.2d 909, 912 (1962). As noted by the Tennessee Supreme Court in *Cecil v. State ex. rel. Cecil*, 192 Tenn. 74, 237 S.W.2d 558, 559 (1951):

> In cases involving child custody, the decision of the Trial Judge who saw and heard the witnesses, is to be given great, if not controlling effect, and we will interfere only where we find a palpable abuse of discretion, or a judgment against the great weight of the evidence.

*Cecil*, 237 S.W.2d at 559.

Upon examination of the transcript and record in this cause it is apparent that the Chancellor gave great consideration to the comparative fitness of Dr. Herrera and Mrs. Herrera to serve as custodial parents. The Chancellor concluded that Mrs. Herrera was the better of the two parents to have primary custody of the children. Nevertheless, Dr. Herrera was granted liberal visitation privileges. The Chancellor's decision in this regard is presumed to be correct and should be upheld on appeal because the evidence presented to this Court does not preponderate against the trial court's findings. Rule 13(d) T.R.A.P.

## CHILD SUPPORT

In the Final Decree of Divorce, the Chancellor ordered Dr. Herrera to pay monthly child support in the amount of $3,500. The trial court also ordered Dr. Herrera to pay the children's school tuition, books, lunches, activity fees, school trips and tutoring, if necessary. In addition, Dr. Herrera was ordered to maintain health insurance and life insurance for the benefit of the children and to pay the Guardian Ad Litem's fee. On appeal, Dr. Herrera asserts that the trial court ordered child support in an amount that exceeds his ability to pay.

▪ T.C.A. § 36–5–101(e)(2) provides that child support awards are to be governed by the guidelines promulgated by the Tennessee Department of Human Services, and that courts are to follow these guidelines when setting child support. The amount of child support is "... based on a flat percentage of the net income ... of the obligor depending on the number of children to be supported." Tenn.Comp.R. & Regs. 1240–2–4–.03(2) (1991). If the trial court determines that the obligor spouse's monthly income exceeds $6,250, then the child support guidelines may not be appropriate. *Nash v. Mulle*, 846 S.W.2d 803, 805 (Tenn.1993). T.C.A. § 36–5–101(e)(1) (1995) provides that in those situations which warrant a deviation from the child support guidelines, the trial court must make "... a written finding that the application of the child support guidelines would be ... inappropriate in that particular case, ..."

In this case, the trial court deviated from the child support guidelines upon its finding that Dr. Herrera was underemployed. The Chancellor stated:

As to this issue of child support, the Court finds that Dr. Herrera has an ability to pay beyond that which he has presently presented before this Court. The Court finds that he is under employed. It is not because he is lazy because he [is] not. He is a hard working man. It is because he has allowed himself to be so obsessed excessively with this litigation. That the Court finds that once this litigation is over that he will be free to now be far more gainfully employed.

In setting the amount of child support, the trial court concluded that Dr. Herrera could return to a substantial income level by devoting more time to his medical practice. In setting the child support amount, the Chancellor stated:

The child support therefore should be thirty-five hundred dollars per month and I find that is consistent with guidelines based upon what this Court finds is the true income capability of Dr. Herrera, even given some of the other aspects that the Court is mindful of that Mr. Thompson pointed out, which is the reduction in Medicare charges and collectibility and the loss of this long standing relationship in the Kennett, Missouri hospital.

Dr. Herrera asserts that he is not underemployed because underemployment must be willful and voluntary and the trial court made no finding in that regard. Tenn.Comp.R. & Regs. 1240–2–4–.03(3)(c) (1991). As the child support guidelines state,

If an obligor is willfully and voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income, as evidenced by educational level and/or previous work experience.

Tenn.Comp.R. & Regs. 1240–2–4–.03(3)(c) (1991). It is undisputed that Dr. Herrera suffered a significant drop in his income. Evidence presented at trial suggests that this was due in large part to a decrease in his referrals and a decrease in the Medicare reimbursements, and other physicians testified that their income had been reduced by forty to fifty percent since 1989 and 1990.

■ The child support guidelines state that even if there is a finding of willful or voluntary underemployment, the court should set child support based on a finding of earning potential. Tenn.Comp.R. & Regs. 1240–2–4–.03(3)(c) (1991). It is apparent that the trial court set the amount of child support at $3,500 without making an express determination as to Dr. Herrera's earning potential.

MR. BLACK: .... Your Honor, in reference to your finding that Dr. Herrera was under employed, Your Honor, would Your Honor care to make a finding as to what his actual earning capacity or income is....

THE COURT: I'm satisfied with what the record says on that.

Upon consideration of the foregoing, we are of the opinion that the trial court erred in not making a determination as to Dr. Herrera's monthly income potential and in setting the child support obligation. As a result, the case should be remanded to the trial court for a determination of Dr. Herrera's monthly income potential. The amount of child support shall remain $3,500 per month until otherwise ordered.

### REHABILITATIVE ALIMONY

■ The Chancellor ordered Dr. Herrera to pay Mrs. Herrera rehabilitative alimony in the sum of $2,500 per month for 5 years. Rehabilitative alimony is preferred over other types of alimony because the court ultimately wants to sever the ties between the parties so they will no longer be dependent upon one another and so they can "be relieved of the impediments incident to the dissolved marriage...." *Self v. Self,* 861 S.W.2d 360, 361 (Tenn.1993). Dr. Herrera contends that the trial court's award is excessive.

■ Trial courts have broad discretion over awards for alimony. *Jones v. Jones,* 784 S.W.2d 349, 352 (Tenn.App.1989). Determinations concerning the amount and duration of rehabilitative alimony are factually driven and require balancing the many

factors contained in T.C.A. § 36–5–101(d). Appellate courts are not inclined to alter a trial court's alimony determination unless the trial court's discretion has been manifestly abused. *Ingram v. Ingram,* 721 S.W.2d 262 (Tenn.App.1986).

■ T.C.A. § 36–5–101(d) sets forth relevant factors that the trial court should consider when determining the amount of alimony that is appropriate as well as the length of the term and the manner of payment. The first factor found in the statute requires a consideration of the relative earning capacity and financial resources of each party. During the years prior to the initiation of the divorce proceedings, Dr. Herrera earned income as a thoracic and cardiovascular surgeon which approached $1 million per year in the late 1980's and early 1990's. In comparison, Mrs. Herrera's earning capacity was approximately $2,000 per month. In considering the relative education and training of each party, it is apparent that Dr. Herrera's training and education far exceed that of Mrs. Herrera. However, it should be noted that Mrs. Herrera has been trained as a registered nurse and practiced that profession for approximately 5 years before her marriage to Dr. Herrera. The parties were married for approximately 8 years before Mrs. Herrera filed for divorce and there has been no showing that the age, physical or mental condition of Dr. Herrera or Mrs. Herrera adversely impacts their ability to work.

Trial courts are also called upon to consider the parties standard of living that was established during the marriage. It is undisputed that the Herrera's enjoyed an affluent life style during their marriage, and that Dr. Herrera's income permitted them to enjoy a large home in a fine neighborhood, a vacation condominium, a farm as well as numerous social and professional endeavors. Upon consideration of the record, it is apparent that both parties made both tangible and intangible contributions to the marriage.

As has been previously discussed, Mrs. Herrera was the parent primarily responsible for the care of the parties' children. Furthermore, Mrs. Herrera participated in many activities for the benefit of Dr. Herr-

era's medical practice. In considering the relative fault of the parties, the trial court concluded that Dr. Herrera was "the predominant reason for the breakup of this marriage." Contrary to Dr. Herrera's assertions, the Chancellor in this case did not provide Mrs. Herrera with a lifetime profit sharing plan.

The amount of alimony awarded in a divorce proceeding is in the sound discretion of the trial court. As this Court held in *Renick v. Renick,* No. 01A01–9007–CV–00263, 1991 WL 99514 (Tenn.App. June 12, 1991), *perm. app. denied.*

> A trial judge's discretion in awarding alimony, when soundly exercised will not be disturbed on appeal. *Shackleford v. Shackleford,* 611 S.W.2d 598 (Tenn.App. 1980). There are no "hard and fast rules" governing the amount of alimony which may be decreed to the wife.

*Renick,* slip op. at 9. Thus, the appellate court will not revise the exercise of the trial judge's discretion except where such discretion has been manifestly abused.

Upon consideration of all relevant factors, the trial court in this cause found that Mrs. Herrera was entitled to $2,500 per month in rehabilitative alimony. Specifically, the court explained its reasoning as follows:

> As to the issue of alimony and in accordance with [T.C.A. § 36–5–101(d) ], specifically sections one, two, eight, nine, ten and eleven, the Court is taking into account the relative earning capacity of the parties, the relative education and training and ability [of] each to improve their earning capacity, takes into account the standard of living that the parties have enjoyed, the potential of future earning capacity that I have already mentioned, the extent to which each party has made such tangible and intangible contributions to the marriage, and the Court finds that she made substantial [contributions]. And the Court does believe that it was their mutual desire that when she started having these children, that she not be actively engaged in full time employment outside the home.

We do not find that the trial court was in error in setting the alimony at $2,500 per

month and so affirm the trial court in this regard.

## MARITAL DEBT

The trial court divided the marital property and adjudged all the marital debt, with the exception of the debt on the marital residences, to Dr. Herrera. He asserts that the trial court failed to make any findings as to whether the debts were marital or separate. Furthermore, he asserts that the trial court did not make any determination as to the value of each debt, nor did it take into account the property division in assigning the debt obligations. Consequently, Dr. Herrera maintains that the trial court relied solely upon the parties' Rule XV affidavits when dividing the marital property and marital debt.

 Marital debt should be allocated as are marital assets and should be considered when making an equitable division of property. *Newberry v. Newberry*, 493 S.W.2d 99, 102 (Tenn.App.1973). Because Tennessee is a dual property jurisdiction, the trial court should separate individual and marital debts. *Batson v. Batson*, 769 S.W.2d 849 (Tenn.App.1988); *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn.App.1989). Dr. Herrera maintains that the Chancellor erred in not making a finding as to the classification of both the marital and the separate debts. However, Dr. Herrera points to no place in the record where such a finding was requested. *Mondelli* set forth the following factors which a court should weigh when dividing marital debt: (1) which party incurred the debt and the debt's purpose, (2) which party benefitted from incurring the debt, and (3) which party is best able to assume and repay the debt. *Mondelli*, 780 S.W.2d at 773.

 This Court customarily gives great weight to decisions of the trial court in dividing marital estates and we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results from some error of law or misapplication of statutory requirements and procedures. *Wade v. Wade*, 897 S.W.2d 702, 715 (Tenn.App.1994). The trial court's distribution need not be equal to be equitable. *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn.App.1988). We find that the trial court, in adjudging the liability for the debt to Dr. Herrera, determined by implication that the debt was marital and not separate debt. With the exception of the items listed below, we find that the trial court's award of marital debt to the husband was proper, supported by the evidence and should be sustained on appeal. The Court will, however, modify two items listed as debt on Mrs. Herrera's affidavit so as to adjudge a portion of the liability to her.

 Mrs. Herrera listed as liabilities a $12,885 loan from her parents and an outstanding debt of $1,275 owed to David Blalock, Attorney. In examining the use of the loan proceeds received from her parents, the Court concludes that of the $12,885 loan, $9,600 was for expenses related to the divorce proceedings, including investigation fees, legal fees, expenses and transcript fees. It appears that the remaining proceeds of $3,285 were for the support of Mrs. Herrera and the children. The $1,275 debt owed to David Blalock appears to be for legal expenses. The Court finds that Dr. Herrera is liable for the $3,285 Mrs. Herrera borrowed from her parents for her and the children's support. For reasons more fully discussed below, the Court finds that liability for the $9,600 borrowed for legal-related expenses and liability for the $1,275 owed to David Blalock, which total $10,875.50, should be divided equally between Dr. Herrera and Mrs. Herrera with each party responsible for 50% or $5,437.50.

In adjudging liability for the debt to Dr. Herrera, the Chancellor decreed that because of Dr. Herrera's bankruptcy, the debt was in the nature of support and was not dischargeable in bankruptcy by application of *In re Calhoun*, 715 F.2d 1103 (6th Cir.1983). On appeal, Dr. Herrera asserts that the trial court failed to properly consider each of the factors enumerated in *In re Calhoun* as they applied to each debt. Such conduct, Dr. Herrera maintains, is an abuse of discretion.

 In *Calhoun*, the Sixth Circuit formulated a four-part inquiry by which a court could determine whether the assumption of a

debt obligation was in the nature of support. *In re Fitzgerald,* 9 F.3d 517, 520 (6th Cir. 1993) provides a summary of the *Calhoun* criteria:

> First, the obligation constitutes support only if the state court or parties intended to create a support obligation. Second, the obligation must have the actual effect of providing necessary support. Third, if the first two conditions are satisfied, the court must determine if the obligation is so excessive as to be unreasonable under traditional concepts of support. Fourth, if the amount is unreasonable, the obligation is dischargeable to the extent necessary to serve the purposes of federal bankruptcy law. 715 F.2d at 1109–10. The burden of demonstrating that an obligation is in the nature of support is on the non-debtor. 715 F.2d at 1111.

*In re Fitzgerald,* 9 F.3d at 520.

In adjudging liability for the debts to Dr. Herrera, the trial court noted in its decree:

> The Court . . . has followed the criteria laid down in [*In re Calhoun,* 715 F.2d 1103 (6th Cir.1983) ], . . . and finds that with the exception of the transfers of property pursuant to T.C.A. § 36–4–121 . . . all of the amounts ordered to be paid in whatever form are considered to be for the maintenance and support of Plaintiff and the parties' minor children and to the extent of the authority of this Court to so declare, are non-dischargeable in Bankruptcy as they meet the criteria laid down in 11 U.S.C. § 523(a)(5) and in [*In re Calhoun* ], . . . to qualify as non-dischargeable debts owed to Plaintiff for her support and the support of the children. The Court specifically finds that all obligations of Defendant pursuant to this Final Decree of Absolute Divorce, with the exception of those contained in Paragraphs 6 and 7 herein are intended by this Court and are support obligations necessary to insure the daily needs of Plaintiff and the minor children. This Court also specifically finds that the amount of support contained herein is not so excessive that it is manifestly unreasonable under traditional concepts of support and that the Defendant has a general abili-

ty to pay the support obligations contained herein.

■ In the Decree, the trial court found (1) that the obligations imposed upon Dr. Herrera were intended by the court to create a support obligation; (2) the court found that the obligation had the effect of providing necessary support for the daily needs of Mrs. Herrera and the parties' two minor children; and (3) the court specifically found that the obligation was not unreasonable under traditional concepts of support. We find that the trial court explicitly analyzed the debts according to the *Calhoun* analysis and properly made its determination of non-dischargeability. The trial court's determination in this regard is presumed correct and will be affirmed on appeal.

## *ATTORNEYS' FEES*

The trial court ordered that Dr. Herrera pay Mrs. Herrera's attorneys' fees and associated expenses and costs which amounted to $101,916.51. Since Dr. Herrera could not pay the fees at that time, the court directed that he should pay the fees at the rate of $2,000 per month at 5% interest. Dr. Herrera asserts that the award of attorney fees was improper because (1) he does not have the means to pay fees in such an amount; (2) Mrs. Herrera was awarded a significant portion of the marital estate; (3) Mrs. Herrera is able-bodied and employable; and (4) Mrs. Herrera was partially responsible for the high fees.

■ Attorney's fees constitute alimony *in solido,* and T.C.A. § 36–5–101(d) (1995) sets forth the relevant factors to consider when making an alimony award. *Houghland v. Houghland,* 844 S.W.2d 619, 623 (Tenn. App.1992). Need is the critical factor to be considered in making an award of alimony, and an award of attorney's fees is proper when one spouse is disadvantaged and does not have sufficient resources with which to pay attorney's fees. *Lancaster v. Lancaster,* 671 S.W.2d 501, 503 (Tenn.App.1984); *Thompson v. Thompson,* 797 S.W.2d 599 (Tenn.App.1990). In *Fox v. Fox,* 657 S.W.2d 747, 749 (Tenn.1983), our Supreme Court stated:

The right to an allowance of legal expenses is not absolute. It is conditioned upon a lack of resources to prosecute or defend a suit in good faith. This rule is to enable the wife, when destitute of means of her own, to obtain justice and to prevent its denial ... If a spouse does not have separate property of her own which is adequate to defray the expenses of suit, certainly she should not be denied access to the courts because she is unable to procure counsel.

*Fox*, 657 S.W.2d at 749.

■ In the instant case, the trial court awarded significant assets to Mrs. Herrera and ordered that Dr. Herrera assume liability for more than $900,000 in debt. Mrs. Herrera is able-bodied and employable, having been trained as a registered nurse. The record also reveals that Dr. Herrera has significant support obligations as a result of this and a prior marriage, and Dr. Herrera appears to be in financial straits as evidenced by the fact that he filed for bankruptcy protection. After balancing the needs and means of the parties, it appears that Mrs. Herrera has the means and assets with which to pay a portion of her legal fees. Accordingly, the judgment below is modified to the extent that Dr. Herrera is ordered to pay one-half of the above amount at the rate of $2,000 per month at 5% interest.

### FAILURE TO RECUSE

On February 8, 1994, Mrs. Herrera filed a "Petition of Scire Facias" in which she alleged that Dr. Herrera had not paid his support obligations due on February 1, 1994 amounting to $4,200. She prayed that after a hearing had been held, the chancery court would hold Dr. Herrera in contempt of court and order him to pay the past due support and attorney's fees. The matter was set to be heard on February 16, 1994, but was continued until March 10 and later continued until March 24. Ultimately the cause came to be heard on March 29, 1994, at which time Defendant's attorney announced in open court that Dr. Herrera was performing emergency surgery and was unable to attend the hearing. The trial court ordered Dr. Herrera to appear on March 30, 1994 "irre-spective of any medical obligations." When Dr. Herrera failed to appear at the March 30, 1994, hearing, the trial court issued its "Order for Attachment Pro Corpus" and ordered the defendant to appear in court on April 4, 1994. On April 4, 1994, the trial court issued a second "Order for Attachment Pro Corpus" in which the court ordered the defendant to appear in court on April 5, 1994.

That same date, April 4, 1994, Defendant filed a motion to disqualify the Chancellor from presiding over the contempt charges pending against Defendant. In his motion, Dr. Herrera relied upon Rule 42 T.R.Crim.P. which provides, in relevant part: "(b) Disposition upon Notice and Hearing", "If the contempt charge involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the hearing except with the defendant's consent." Also, Dr. Herrera asserts that the Chancellor should have disqualified himself from hearing the charge of contempt by operation of the Rules of the Supreme Court. Specifically, Rule 10, Rules of the Supreme Court, Canon 3(C)(1)(a), expressly provides:

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

Dr. Herrera alleges that the trial court demonstrated bias by (1) setting alimony and child support in an amount that was in excess of Dr. Herrera's net income; (2) stating in the final decree of divorce that the defendant was "underemployed;" and (3) ordering defendant to appear at the contempt hearing "irrespective of any medical obligations." As further evidence of bias, Dr. Herrera maintains that the Chancellor set the bond in an amount that included an allowance for opposing counsel's attorney fees. Also, Dr. Herrera asserts bias in the Chancellor's awarding marital debt to Dr. Herrera and declaring it not subject to discharge in bankruptcy. The trial court denied Dr. Herrera's motion to disqualify, determining that Dr. Herrera's

contempt of court was not committed out of disrespect to the judge himself.

Dr. Herrera relies upon *State v. Green*, 708 S.W.2d 424 (Tenn.Crim.App.1986), to support his motion to disqualify. In *Green*, the contemnor was an attorney defending a criminal case. The attorney had directed numerous sharp and critical statements toward the trial judge presiding over the criminal case. The trial judge found the attorney to be in contempt of court. The appellate court recognized that if one is charged with contempt involving disrespect to or criticism of a judge, that judge is required to recuse himself from presiding over the contempt proceeding unless the defendant otherwise consents. *Green*, 708 S.W.2d at 427; *See also*, Rule 42 T.R.Crim.P. As a result, the trial judge in the *Green* case was disqualified from hearing the charge of contempt involving the defendant's attorney. *Id.* at 426–27.

■■■ We find that the *Green* case is distinguishable from the instant case. In *Green*, the trial court specifically found that the statements at issue were insulting to the judge personally. *Id.* at 426. However, the criminal contempt charge in the instant case and the Chancellor's finding of contempt relates solely to Dr. Herrera's failure to comply with the trial court's orders of support. There is no charge that Dr. Herrera was disrespectful to or critical of the particular chancellor presiding over the matter. The Chancellor in the instant case held that in order for Rule 42(b) T.R.Crim.P. to require recusal, there must have been a charge of disrespect to or criticism of the particular judge or chancellor. The Chancellor's determination in this regard is supported by *Green*, *supra*. *See also*, *In re Throneberry*, 754 S.W.2d 633, 636 (Tenn.Crim.App.1988). It is apparent that Rule 42 T.R.Crim.P. requires recusal only in those limited situations where the charged conduct involves a personal criticism against or disrespect toward the particular judge presiding over the contempt proceedings. The instant case presents a violation of a court order and nothing more. While the violation of a valid court order exhibits disrespect toward the judicial system, that is not the type of conduct addressed by Rule 42. Accordingly, the Chancellor properly ruled that he was not disqualified from presiding over the proceedings.

■■■ In regard to Dr. Herrera's allegations that the Chancellor violated Rule 10, Canon 3, Rules of the Supreme Court, the court similarly finds no violation. The court does not find that the trial court's issuance of the Attachment Pro Corpus and having Dr. Herrera placed in handcuffs constitutes sufficient evidence of bias and prejudice. The Chancellor clearly explained that Dr. Herrera's conduct necessitated this response because Dr. Herrera had, on two occasions, failed to appear for the contempt hearing and because of his efforts to avoid apprehension by the Sheriff. Finally, Dr. Herrera contends that the Chancellor set an excessive bond which included an allowance for the opposing counsel's attorney fees, when the only way opposing counsel would be entitled to fees would be if Dr. Herrera had been found to be in contempt of court. The trial court was correct in its ruling that it would have been improper to set a bond at an arbitrary figure and the court found it proper to set the bond on "some kind of reasonable basis ... rather than just pulling figures out of the air." In *Embry v. Chimenti*, No. 02A01–9305–CV–00116, 1994 WL 81221 (May 3, 1994), this Court addressed a similar situation. Embry had requested that the trial judge recuse himself on the grounds that he was biased and prejudiced. The trial judge had previously made adverse rulings against Mr. Embry including entry of an order which eventually led to Mr. Embry's arrest and to subsequent criminal charges being filed against Embry. The trial judge declined to recuse himself, and on appeal, this Court affirmed.

The mere fact that the Chancellor in the instant case had issued adverse rulings against Dr. Herrera does not, in and of itself evidence bias or prejudice toward the defendant. In fact, it appears to this Court that the trial court accommodated Dr. Herrera's numerous requests for continuances. In summary, the court affirms the Chancellor's refusal to recuse himself from consideration of the charges of contempt involving Dr. Herrera.

*PUNISHMENT FOR CONTEMPT*

 Dr. Herrera alleges that the Chancellor erred in finding him guilty of criminal contempt. In the alternative, Dr. Herrera asserts that the Chancellor imposed an excessive punishment for any contempt that may have occurred. A court's power to punish a party for contempt in failing to pay child support is set forth at T.C.A. § 36–5–104(a) which provides:

> Any person, ordered to provide support and maintenance for a minor child or children, who fails to comply with the order or decree, may, in the discretion of the court, be punished by imprisonment in the county work house or county jail for a period not to exceed six (6) months.

As a result of the hearing on the contempt charges against Dr. Herrera, the Chancellor sentenced Dr. Herrera to the maximum sentence provided by statute. Specifically, the court declared in its order:

> The Court further finds that Defendant should be incarcerated at the Shelby County Correctional Institute or any other appropriate place within the Shelby County Penal System for a period of six months; Defendant shall serve this confinement 24 hours at a time one day each month which shall be the first Sunday of each month beginning at 5:00 a.m. on Sunday and ending at 5:00 a.m. on Monday; the Court further finds that after an appropriate period of time Defendant may petition the Court to suspend the remainder of the sentence and the Court will take into consideration such factors as the Court deems appropriate at that time to decide whether any or all of the remaining time should be suspended.

Dr. Herrera urges on appeal that this Court set aside or modify this sentence, which is an action within an appellate court's power when the imposed sentence is excessive. *Robinson v. Air Draulics Engineering Co.*, 214 Tenn. 30, 377 S.W.2d 908, 913 (1964). The trial court decreed that after Dr. Herrera had served 12 days, he could petition to suspend the remaining sentence.

 Appellate courts are loathe to interfere or modify the punishment imposed in contempt proceedings because such determinations lie within the sound discretion of the trial court. *Huffine v. Huffine*, No. 03A01–9110–CH–00339, 1992 WL 110788 (May 27, 1992). However, as previously noted, T.C.A. § 36–5–104(a) provides that a court may impose a maximum penalty of six months imprisonment for failure to abide by an order regarding support payments. Due to the fact that the punishment for contempt is a determinate sentence not to exceed six months, the offense falls within a Class B misdemeanor category as defined by T.C.A. § 40–35–111(e)(2). The order provided that Dr. Herrera was to serve his sentence one day per month until he had satisfied six months of total incarceration. Six months is approximately 180 days. If the order were carried out to its express end, Dr. Herrera would have to report to the Shelby County correctional system once a month for more than 15 years in order to satisfy the 6 months or 180 days total sentence which he has been ordered to serve. The trial court has thus sentenced Dr. Herrera to periodic confinement, and Dr. Herrera is under an implied probation during those intervals in which he is not a guest of the county. Such a sentence violates T.C.A. § 40–35–307 which provides in relevant part:

> (b) If the court sentences a defendant to a term of probation involving periodic confinement, it shall specify:
>
> (1) The total number of months or days to be served in periodic confinement, which shall not exceed one (1) year or the maximum term authorized for the offense; whichever is less; and
>
> (2) The days or parts of days the defendant is to be confined.

As previously noted, Dr. Herrera would have to be subjected to periodic confinement one day per month for more than 15 years in order to fully satisfy the sentence that the trial court imposed upon him. T.C.A. § 40–35–307(b) clearly provides that the total number of months or days served in periodic confinement coupled with probation shall not exceed the maximum term authorized for the offense. In this case, that is six months by operation of T.C.A. § 36–5–104. Even for Dr. Herrera to satisfy the minimum of 12 days confinement in order to petition the court for a suspension of the remainder of

the sentence violates T.C.A. § 40–35–307. By operation of T.C.A. § 40–35–307, the sentence of periodic confinement coupled with probation that was imposed upon Dr. Herrera in this case must be served and completed within the six (6) month period provided by T.C.A. § 36–5–104. The period of time for completion of the sentence cannot be extended simply by breaking the sentence into periodic confinement coupled with probation. The maximum penalty for failure to provide child support in the State of Tennessee is 6 months incarceration and any punishment imposed upon a party in contempt for failing to provide said support must be completed within a six month period. Therefore, on remand the Chancellor shall modify the sentence in accordance with this opinion.

This cause is further remanded for a further hearing to determine the amount of Husband's potential income and the amount of child support commensurate therewith. The marital debt and amount of Wife's attorney fees are modified as heretofore stated. The judgment of the trial court is otherwise affirmed.

Wife's request for additional attorney fees for this appeal is denied. Costs on appeal are taxed to Husband, for which execution may issue if necessary.

CRAWFORD, P.J., W.S., and HAYES, Special Judge, concur.