IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 9, 2010 Session

**MITCHELL DWAYNE GENTRY, v. JERICA RENAE GENTRY**

**Appeal from the Circuit Court for Hamilton County**
**No. 09-D-102      Hon. Neil Thomas, Judge**

**No. E2010-00943-COA-R3-CV - FILED DECEMBER 28, 2010**

In this divorce case after lengthy trial, the Trial Court designated the mother as the primary residential parent, awarded the mother alimony, child support, and attorney's fees. The father appealed, asking the Trial Court be reversed on the award of primary care, and the alimony award to the mother. The mother appeals the issue of whether the father was entitled to appeal, since he had been held in contempt of court. Upon consideration of the issues, we affirm the Judgment of the Trial Court.

**Tenn.  R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, J.,  and JOHN W. MCCLARTY, J., joined.

Daniel K. Habenicht, Chattanooga, Tennessee, for the appellant, Mitchell Dwayne Gentry.

Ruth H. DeLange, Englewood, Florida, for the appellee, Jerica Renae Gentry.

**OPINION**

Plaintiff, ("father"), brought this action on January 2, 2009, against defendant ("mother") alleging that she had been guilty of inappropriate marital conduct. The Complaint alleged that the parties had two children, d.o.b. 10/01/03, and d.o.b. 2/01/07, and the father sought designation as the primary residential parent, along with child support, alimony, and equitable distribution of the parties' assets/debts.

The father filed an Affidavit, stating that on November 15, 2008, the mother suddenly moved to Arkansas with the children. Further, that on December 6, 2008, the mother signed a power of attorney allowing the father's parents to have guardianship of the children and to bring them home to Hamilton County, Tennessee. The father stated his parents had custody of the children until he returned from active duty on December 18, 2008, but he had physical custody of the children since that time.

The Court entered a Temporary Order designating the father as primary residential parent, on the basis that the father represented that the mother said she was going to take the children to Arkansas and not return them.

The mother answered *pro se*, stating the father was guilty of inappropriate marital conduct, and asked the Court to award her a divorce and to give her custody, child support, alimony, and attorney's fees, based on the father' adultery. Subsequently, the parties entered into a Temporary Agreed Order Setting Residential Schedule and Order Setting Trial Date. They agreed that the mother would have 4 telephone calls per week with the children, and would have additional parenting time with the children if she came to Hamilton County (with 24 hours' notice). Further, she would have the children from July 2 until July 25, 2009, and would pay temporary child support to father of $200.00 per month.

A trial was held on September 22 and 23, 2009, and the father testified that he was living in the marital residence in Ooltewah that the parties had purchased in May 2008. The father testified that he had been stationed in Italy prior to being discharged from the military in December 2008, and that one of the children was in kindergarten, and the other was in daycare. The father testified that he thought the mother was living in Arkansas, but he did not know with whom or where. Further, that he worked 8-5 Monday through Friday, and was on call on the weekends.

The father testified that he served in the National Guard from 2000 to 2003, went into active duty in 2003, and that he had served two tours of duty in Iraq. Further that he had been stationed in Italy, Kentucky, Georgia, and South Carolina. He testified that he was a native of Arkansas, and that the mother lived there during their marriage with his parents while he was stationed elsewhere. He testified that his parents moved to Ooltewah two years before, and that he had been honorably discharged from the military.

The father testified that the mother could not obtain employment in Italy, and they began arguing because she said she could not stand being with the kids all the time, and that they decided it would be better for the mother and the children to move back to the United States, and they moved to Tennessee and stayed with his parents.

The father testified the mother had a job between May and December 2008, working as a teacher at the daycare where the children attended. He testified that the only other employment the mother had during their marriage was working seasonally at Sears and babysitting children in their home at Fort Campbell.

The father testified that the children had done well, and the mother had accused him of not properly caring for the children, and that the mother had some type of warehouse job.

The father further testified that he felt he should be primary residential parent because the mother did not have a stable lifestyle, and did not try to better herself financially or get a better job, and that he knew the mother had a boyfriend that she spent time with in Arkansas who was also in the military. Further that he had phone records showing calls from the boyfriend to the mother.

On cross-examination, the father admitted that while in Italy, he and the mother drank at their home, and also sometimes went out to a neighborhood hangout to drink. The father identified pictures of him drinking in a bar with friends, and he said that this occurred during a time when the mother and the children were not in Italy. The father testified that the female in the picture was his friend Rachel, and that it appeared that he was licking her breast, but he was not. The father identified another photograph of him and Rachel, whom he described as his "best friend", with her arm around him, and another where Rachel and another female friend were drinking from a drink cup between his legs.

The father testified that he also had a friend named Keisha whom he had been out drinking with a time or two in Italy. He admitted that he had taken trips with Rachel and other friends and stayed in a hotel with them. The father testified that he booked a double room, but that he actually stayed by himself, and that he told the mother that Rachel was his best friend and that they hung out together.

The mother testified that after they married they stayed in Fort Campbell a couple of months and then the father deployed and she moved home to Arkansas to live with her mother because she was pregnant and didn't want to be alone.

The mother said that she had a good relationship with his parents and they treated her like a daughter. She testified that she always trusted the father's parents with the children, but she did not expect that they would take the children and keep them like they had done. The mother also testified about her husband's relationship with the two women, admitted by the father to be his "best friends".

After the evidentiary hearing concluded, the Trial Court entered a Memorandum Opinion, stating that the parties had attended mediation, and had agreed upon the proper allocations of assets and debts. The Court thus stated that it only had to resolve custody and parenting time, award of divorce, alimony and attorney's fees, and the division of the 2008 tax refund.

The Court found that while the father had denied having an affair, there was direct evidence of same in the form of an email he authored, and pictures of female "friends", one of which was partially nude. The Court found that the mother also denied having an affair and that there was also some circumstantial evidence that she had, although not to the extent of the evidence that the father had, and the Court awarded the divorce to the mother.

The Court discussed the factors set forth in Tenn. Code Ann. §36-6-106 regarding designation of primary residential parent, and found that the first two factors (love, affection and emotional ties, and disposition to provide care and food) were equal to both parents. The Court stated that continuity also weighed equally, because the children had been moved around somewhat extensively. The Court stated that the father's family appeared to be more stable than the mother's, but the Court stated that with regard to physical and mental health, the mother was more stable due to the father's diagnosis of PTSD and depression, although this had not recurred since he left the military.

The Court found that the children were too young to make a finding regarding school or community record, and were also too young to express a preference. The Court held that the parties weighed equally with regard to past and potential for future performance of parenting responsibilities. The Court found that there was some evidence of a lack of homemaking skills on the mother's part, but that given the evidence of the father's affairs and his denial of same, the Court had to question the father's judgment, and awarded the mother primary custody of the children. The Court awarded mother $729.00 per month in child support, and rehabilitative alimony of $200.00 per month for three years. The Court awarded the mother $2,000.00 in attorney's fees, and split the 2008 tax refund equitably.[1]

On appeal, these issues are raised:

1. Did the Trial Court err in naming the mother primary residential parent?

2. Did the Trial Court err in awarding alimony to the mother considering the debt the father took on and his ability to pay?

---

[1]The Parenting Plan attached to the Decree gave the mother 272 days with the children and the father 93 days with the children per year.

3.    Is the father entitled to appeal since he is in contempt of the Court order regarding alimony and child support?

The father argues that the Trial Court erred in its designation of the mother as primary residential parent. This decision is reviewed under an abuse of discretion standard, and the Trial Court's decision will be upheld so long as "reasonable minds can disagree as to the propriety of the decision made". *Herrera v. Herrera*, 944 S.W.2d 379 (Tenn. Ct. App. 1996; *Eldridge v. Eldridge*, 42 S.W.3d 82 (Tenn. 2001). As this Court said in *Herrera*:

> "Absent some compelling reason otherwise, considerable weight must be given to the judgment of the Trial Court [in a divorce proceeding] in respect to credibility and suitability" of the parties as custodians. The trial courts are vested with a wide discretion in matters of child custody, and the reviewing courts will not interfere except upon a showing of erroneous exercise of that discretion. The trial court enjoys a substantial advantage in having the opportunity to see, hear and evaluate the parents suitability as custodians. As this Court noted in *Bah v. Bah*, 668 S.W.2d 663:
>
> > [T]his Court will, however, give great weight to the decision of the trial court because the judge saw the witnesses face to face and heard them testify; this rule being based upon the assumption that the trial judge did not act arbitrarily or willfully but with the regard to what is right and equitable, considering first the child's best interest as directed by his reason and conscience towards the child's welfare.

*Herrera* at 385-386 (internal citations omitted).

Accordingly, we do not reverse the Trial Court's decision on this issue unless it is shown that the Trial Court abused its discretion.

Tenn. Code Ann. §36-6-106(a) lists the factors to consider when determining which parent should be named primary residential parent, as follows:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7)     (A) The reasonable preference of the child, if twelve (12) years of age or older;

        (B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

The Trial Court weighed the factors, and made specific findings. The Court concluded that considering the totality of the facts, the Court was concerned with the father's

judgment with regard to his alleged affairs and his denials, which tipped the scale in the mother's favor.

Reviewing the evidence at trial, the evidence does not preponderate against the Trial Court's findings on this issue. The evidence showed that the children had love and affection for both parents, and that both parents could provide for them, although the mother seemed more concerned with the medical issues involving the children. Essentially, the Trial Court properly evaluated the various factors in light of the evidence.

As reiterated, the Trial Court called into question the father's credibility by denying any affairs or any inappropriate behavior, but he was confronted with email messages sent to other women from his email address, text messages sent to the mother from his cell phone declaring his love for another woman, and nude photos of his "best friend" found in his carry on bag. There is a plethora of evidence of the father's inappropriate behavior, but he denied each and every charge, nevertheless. He argues that he was punished for alleged affairs while the mother was not, but the Trial Court judged his credibility and found his judgment lacking. As stated earlier, "[t]he trial court enjoys a substantial advantage in having the opportunity to see, hear and evaluate the parents suitability as custodians", which is why this Court should not reverse the trial court's decision absent an abuse of discretion. *See Herrera.* Having shown no abuse of discretion here, the Trial Court's decision is affirmed.

The father next argues that the Trial Court erred in its award of rehabilitative alimony to the mother, as there was no proof of her need nor his ability to pay. These types of decisions are reviewed under an abuse of discretion standard. *Ingram v. Ingram*, 721 S.W.2d 262 (Tenn. Ct. App. 1986).

Tenn. Code Ann. §36-5-121(i) lists the factors the court should consider in making an award of alimony, as follows:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

In this case, the evidence establishes the father had a greater earning capacity than mother, as his net income was shown to be $2,600.00 per month, and mother's was shown to be around $1,200.00 per month. The father had his military education and training, and was able to secure a profitable job in the computer/IT field, while the mother was working as a customer service representative, and had meager education and training The mother had worked intermittently throughout the marriage, but spent most of her time working as a homemaker. The parties were of similar age and physical ability, and the extent of the marriage was seven years. Neither had significant separate assets, because of the young age at which they married, and the father retained more of the marital property (i.e. the house, which was encumbered by a mortgage). The mother contributed to the father's increased earning capacity by staying at home with the children while he was in the military, and the father was found to be at fault for the demise of the marriage.

The mother testified that she had a need for alimony in order to provide for herself and

the children on her meager income, while the father testified that he was able to pay expenses for himself and the children based on his income. Thus, we conclude the Trial Court did not err in awarding a small amount of rehabilitative alimony to mother in this case.

The mother argues the father's appeal should not be heard because he is in contempt of the Court's order regarding child support and alimony. This involves facts and events that occurred after the appeal was filed, and there is no information in the record. This issue is without merit.

We affirm the Judgment of the Trial Court and remand, with the cost of the appeal assessed to Mitchell Dwayne Gentry.

_____
HERSCHEL PICKENS FRANKS, P.J.