# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE



FILED

October 21, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| BETTILYNN GAY FORD, | ) | |
| | ) | |
| Plaintiff/Appellee, | ) | Davidson Circuit |
| | ) | No. 86D-1742 |
| VS. | ) | |
| | ) | Appeal No. |
| BRION LEONARD FABIAN FORD, | ) | 01A01-9611-CV-00536 |
| | ) | |
| Defendant/Appellant. | ) | |

APPEAL FROM THE CIRCUIT COURT
FOR DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE MURIEL ROBINSON, JUDGE

For the Plaintiff/Appellee:

Kathryn G. Brinton
Nashville, Tennessee

For the Defendant/Appellant:

G. Kline Preston, IV
Nashville, Tennessee

## AFFIRMED AS MODIFIED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves a dispute over the calculation of child support. Seven years after the divorce, the custodial parent petitioned the Circuit Court for Davidson County for increased child support for the parties' teenage son in light of funds the noncustodial parent was receiving from his mother's estate. The trial court heard the evidence without a jury and increased the noncustodial parent's child support obligation from $50 per week to $750 per month. On this appeal, the noncustodial parent asserts that the trial court erred by increasing his child support and by requiring him to pay the custodial parent's legal expenses. We affirm the trial court's decision to increase the noncustodial parent's child support and to require him to pay a portion of the custodial parent's legal expenses. However, we modify the amount of the noncustodial parent's monthly child support obligation and remand the case to the trial court to recalculate the amount of child support arrearage in a manner consistent with this opinion.

## I.

Brion Leonard Fabian Ford and Bettilynn Gay Ford were divorced in Davidson County Circuit Court in February 1988 on irreconcilable differences grounds. Their marital dissolution agreement provided that Ms. Ford would have sole custody of their nine-year-old son, Jarrod Michael Ford, and that Mr. Ford would have visitation. The agreement also required Mr. Ford to pay Ms. Ford child support of $50 per week until the boy became eighteen or finished high school, whichever occurred later.

The original child support award rested on Mr. Ford's ability to pay child support at the time of the divorce. When the parties divorced, Mr. Ford, the son of nationally-known entertainer Tennessee Ernie Ford, was attempting without much success, to make his living as an actor and singer. Although he continued to pursue an entertainment career after the divorce, Mr. Ford also worked in 1990 and 1991 as a motel desk clerk, earning $11,000 in 1990 and $8,700 in 1991. Since early 1992, Mr. Ford has lived on an inheritance from his mother consisting of distributions from a trust fund set up under his mother's will.

When Betty Jean Ford died in 1989, her estate established the Betty J. Ford Testamentary Trust for the benefit of Mr. Ford and his brother. The trust was funded

with a one-half interest in the artistic properties (royalty rights in audio and video recordings and sheet music) of Tennessee Ernie Ford.[1] The trust is managed by trustees who are empowered to make investments and to make monthly distributions of income to both Mr. Ford and his brother. The trustees may also, in their discretion, make additional "hardship" distributions to Mr. Ford from the trust principal in order to provide either for Mr. Ford's reasonable support or for the reasonable support and education of his son.

Ultimately all the trust's principal is to be paid to Mr. Ford and his brother. According to the trust instrument, the principal is to be paid out on the following schedule: one-half of Mr. Ford's share after Mr. Ford reached thirty-five, one-half of the remainder of his share after he reached forty, with the balance of his share payable after Mr. Ford reaches fifty, if at that time Jarrod Ford is neither in college nor in graduate school.

From February 1992 through June 1996, Mr. Ford received $277,610 in income and principal distributions from the trust, including a one-time distribution of $70,125 in life insurance proceeds. The payments may be broken down as follows:

|  | Principal Inheritance | Trust Income Distributions | Hardship Principal Distributions | Ernest & Betty Ford Life Ins. Trust |
|---|---|---|---|---|
| Feb. 20, through Dec. 31, 1992 | 178,850 | | | |
| Year ended Dec. 31, 1993 | (15,700) | | | |
| Year ended Dec. 31, 1994 | | 9,072 | | 70,125 |
| Year ended Dec. 31, 1995 | | | | |
|     To equalize '92 / '93 inheritance payments | | | | |
|     other ½ principal beneficiary | 10,000 | | 14,863 | |
| Six months ended June 30, 1996 | | 4,900 | 5,500 | |
| | 173,150 | 13,972 | 20,363 | 70,125 |

After Mr. Ford began receiving distributions from the trust, Ms. Ford filed a petition in the Davidson County Fourth Circuit Court in August 1995, requesting increased child support. Mr. Ford opposed the petition. Following a hearing in July 1996, the trial court granted Ms. Ford an increase in child support. The trial court opined that Mr. Ford was underemployed and that Mr. Ford "ha[d] borrowing power and that he ha[d] converted his cash inheritance to the payment of his own expenses." Accordingly, the trial court increased Mr. Ford's child support obligation to $750 per

---

[1]Tennessee Ernie Ford followed his wife in death on October 17, 1991. The evidence at trial did not show that Brion Ford receives any income directly through his father's estate.

month and ordered him to pay Ms. Ford $5,333.30 retroactive to September 1, 1995. The court also imposed a lien for child support on both Mr. Ford's income from his late mother's trust and his real property.

## II.

Mr. Ford mounts a multi-faceted attack on the trial court's decision to increase his child support obligation. He asserts (1) that the trial court erred in determining that he was underemployed, (2) that the trial court miscalculated his income for purposes of setting child support and (3) that the trial court incorrectly applied the Tennessee child support guidelines. We review child support decisions using the standard contained in Tenn. R. App. P. 13(d), affording the trial court's factual findings a presumption of correctness but without extending that presumption to the trial court's legal construction of the guidelines. *See Haynes v. Haynes*, 904 S.W.2d 118, 122 (Tenn. Ct. App. 1995); *Seal v. Seal*, 802 S.W.2d 617, 619 (Tenn. Ct. App. 1990).

### A.
### MR. FORD'S UNDEREMPLOYMENT

Tennessee's child support guidelines establish a rebuttable presumption of a minimum acceptable amount of support based on the noncustodial parent's ability to pay. The guidelines use a straightforward mathematical formula for calculating child support. The presumptive amount of support for the obligor parent is a "flat percentage of the obligor's net income." Tenn. Comp. R. & Regs. r. 1240-2-4-.03(2) (1994). "Net income" ordinarily includes all the obligor parent's income "from any source," Tenn. Comp. R. & Regs. r. 1240-2-4-.03(3)(a), reduced by deductions for withholding tax, FICA, and any other court-ordered child support the obligor is paying.

If the obligor parent is voluntarily unemployed or underemployed, Tenn. Comp. R. & Regs. r. 1240-2-4-.03(3)(d) instructs the courts to calculate child support based on evidenced earning capacity rather than on actual earnings. *See Rust v. Gerbman*, No. 01A01-9608-CH-00361, 1997 WL 266844, at *3 (Tenn. Ct. App. May 21, 1997) (No Tenn. R. App. P. 11 application filed); *Herrera v. Herrera*, 944 S.W.2d 379, 387 (Tenn. Ct. App. 1996). Both Mr. and Ms. Ford argue at length about

whether the trial court correctly found Mr. Ford to be underemployed and, if so, whether his earning capacity for child support purposes should be based on his past demonstrable work experience as a motel desk clerk and would-be entertainer.

The evidence at trial showed that Mr. Ford is forty-six years old and that for the last eighteen years he has pursued a career as an entertainer. He described show business this way: "It's my chosen profession. It's what I know. It's what I grew up with. I have been around it all of my life. It's what I am capable more of making a decent living at more than anything else. I have no trade besides that."

Just how much of a "decent living" show business has provided for Mr. Ford and his dependents is questionable. Before the divorce, Mr. Ford worked for two years in one of the shows at Opryland. After the divorce, he made some radio commercials, sang for eight months in a gospel singing group, and sang in hotel bars as a duet partner with his uncle. He appeared on a TNN show once with his father and one time later to promote the re-issuance of one of his father's recordings. When asked at trial what he had done recently in the entertainment field, Mr. Ford replied, "It's been very slow for the past several years." When later asked why he kept trying, he told the court, "It's what I believe in. I know there is a golden check out there for me somewhere and I will not give up my dream."

Notwithstanding Mr. Ford's hope for a "golden check out there," his tax returns show that as an entertainer Mr. Ford lost $3,013 in 1992; lost $1,899 in 1993; and lost $1,565 in 1994. Given Mr. Ford's long history of marginality as a commercial performer, there is little likelihood that Mr. Ford will ever be a successful entertainer. Any reasonable person who recognizes that he or she has little future in the entertainment business would realistically pursue something else. Mr. Ford seems to be squandering his inheritance on a vain hope that he will one day be a successful entertainer. On the evidence in the record, this court understands why the trial court characterized Mr. Ford as underemployed.

The trial court did not make a factual determination of Mr. Ford's potential income as contemplated by Tenn. Comp. R. & Regs. r. 1240-2-4-.03(3)(d). Thus, we conclude that the trial court's decision was not driven by its belief that Mr. Ford was voluntarily underemployed but rather by the income that Mr. Ford had actually received from the Betty J. Ford Testamentary Trust. Because the trial court looked

to income Mr. Ford actually received, not his potential income if he pursued other employment, all the argument concerning whether Mr. Ford is voluntarily underemployed is a legal non-issue on this appeal.

## B.
### MR. FORD'S INHERITANCE AND LIFE INSURANCE DISTRIBUTIONS

While the trial court's order does not expressly explain how it calculated Mr. Ford's revised child support obligation, both parties concede that the trial court must have based its decision on the income Mr. Ford had been receiving from the Betty J. Ford Testamentary Trust. Mr. Ford contends that inheritance, in general, should not be considered gross income for child support purposes and, that if inheritance can be considered in setting child support, only distributions made of trust income, not distributions made of trust principal, should be considered.

Determining the obligor parent's income is an indispensable part of every child support proceeding. *See Turner v. Turner*, 919 S.W.2d 340, 344 (Tenn. Ct. App. 1995). Tenn. Comp. R. & Regs. r. 1240-2-4-.03(3)(a) defines "gross income" to include "all income from any source . . . whether earned or unearned." Thus, money received by inheritance can be considered as income under the guidelines. *See Lescher v. Lescher*, 679 S.W.2d 463, 465-66 (Tenn. Ct. App. 1984); *see also In re Marriage of Armstrong*, 831 P.2d 501, 503 (Colo. Ct. App. 1992); *Connell v. Connell*, 712 A.2d 1266, 1269 (N.J. Super. Ct. App. Div. 1998). Accordingly, we hold that the trial court correctly considered all the funds Mr. Ford received from the Betty J. Ford Testamentary Trust in determining Mr. Ford's child support obligation.

However, inheritance, like other income, can sometimes come to a recipient over a span of time. That matters, because courts setting child support ordinarily look not so much to the source of the income — whether inheritance, wages, or lottery winnings — as they look to the dependability of its continued receipt. *See, e.g. Crayton v. Crayton*, 944 P.2d 487, 490 (Alaska 1997) (ordering a trial court in setting child support to consider as income money given by a father to his obligor daughter where it was undisputed that the cash gifts would continue through time).

Courts should be wary of increasing child support based on possible income that is merely speculative. *See Whisenhurst v. Whisenhurst*, No. 02A01-9506-CV-

00126, 1997 WL 305296, at *3 (Tenn. Ct. App. June 9, 1997) (No Tenn. R. App. P. 11 application filed). Instead, they should focus on "income regularly received by the obligor." *See Whisenhurst v. Whisenhurst*, 1997 WL 305296, at *3; *see, e.g., Smith v. Smith*, No. 01A01-9705-CH-00216, 1997 WL 672646, at *3 (Tenn. Ct. App. Oct. 29, 1997) (No Tenn. R. App. P. 11 application filed) (allowing courts to consider capital gains from exercised stock options where there is no indication that such stock options to the obligor will cease); *Moore v. Youngquist*, No. 01A01-9012-CH-00433, 1991 WL 57982, at *1 (Tenn Ct. App. April 19, 1991) (No Tenn. R. App. P. 11 application filed) (holding that lottery winnings paid to the lottery winner regularly over time should be considered income for purposes of determining child support).

As far as this record shows, the Betty J. Ford Testamentary Trust will continue to be a source of income to Mr. Ford for as long as he will be required to pay child support. Even though the size of the corpus of the trust was diminished by litigation with Tennessee Ernie Ford's second wife, the trust contains sufficient assets and received sufficient income to pay Mr. Ford the $20,000 corpus distribution due in 1992 and an estimated $77,000 corpus distribution in 2002. In addition to these distributions, a co-trustee testified that Mr. Ford would receive between $14,000 and $15,000 per year in income distributions.

The trial court correctly considered the ongoing distributions from the Betty J. Ford Testamentary Trust as income to Mr. Ford for child support purposes. And it mattered not whether that income stream came from regular inheritance distributions of trust principal, from allowable hardship distributions of trust principal, or from income coming into the trust, as long as funds remain in the trust.

The trial court should not, however, have included the one-time distribution of the $70,125 in life insurance proceeds in its calculation of Mr. Ford's income. Mr. Ford's parents set up the Ernest and Betty Ford Life Insurance Trust before their deaths. The sole purpose of this trust was to receive and distribute the proceeds of his parents' life insurance policies, and the trust was designed to terminate after the one-time distribution of proceeds was made. This distribution occurred one year before Ms. Ford filed her petition, and "there is . . . nothing in the record to suggest that [Mr. Ford] will . . . be the beneficiary of additional [life insurance proceeds] in the future." *See Smith v. Smith*, 1997 WL 672646, at *3. Accordingly, the trial court

should not have included the $70,125 in life insurance proceeds in arriving at Mr. Ford's average annual income for child support purposes.

## C.
### MR. FORD'S CHILD SUPPORT OBLIGATION

After ascertaining the obligor parent's income, the guidelines require the court to calculate the obligor parent's monthly child support obligation using set percentages. *See* Tenn. Comp. R. & Regs. r. 124-2-4.03(5) (1997). That amount of support is then presumptively correct. *See* Tenn. Comp. R. & Regs. r. 1240-2-4-.02(7) (1994).

Mr. Ford has no fixed wages or salary, and his inheritance income has varied through the four years immediately preceding trial. All evidence indicates that the inheritance income will continue to vary up until Mr. Ford receives the last of the trust principal in 2002. The guidelines provide that variable income should be averaged. *See* Tenn. Comp. R. & Regs. r. 1240-2-4-.03(3)(b); *Smith v. Smith*, 1997 WL 672646, at *3; *Anderton v. Anderton*, No. 01A01-9701-CH-00013, 1998 WL 289338, at *4 (Tenn. Ct. App. June 5, 1998) (Tenn. R. App. P. 11 application pending). Averaging is appropriate in this case because Mr. Ford received $207,485 from the Betty J. Ford Testamentary Trust between February 1992 and June 1996.

We compute Mr. Ford's modified child support thusly:

| | |
|---|---|
| Total income to Ford from trust, excluding life insurance proceeds, from February 1992 to June 1996 (53 months) | $207,485 |
| Average gross monthly income from trust for the 53 month period | $3,914.81 |
| Amount of monthly child support for one child under the guidelines | $602 |

We concur with the trial court's conclusion that the modifications to Mr. Ford's child support obligation should be made retroactive to September 1, 1995. *See* Tenn. Code Ann. § 36-5-101(a)(5) (Supp. 1998). We also agree that Mr. Ford should receive credit for all child support payments he has made during this period and while this case has been on appeal. Accordingly, on remand, the trial court should recalculate the amount of Mr. Ford's lump sum child support obligation in accordance with this opinion.

## III.

### THE AWARD OF ATTORNEY'S FEES

As is common in child support modification appeals, Mr. Ford takes issue with the trial court's order directing him to pay the legal fees Ms. Ford incurred in the proceedings in the trial court. Decisions to award attorney's fees in child support cases are discretionary with the trial court. *See* Tenn. Code Ann. § 36-5-103(c) (Supp. 1998). As a general matter, the courts allow custodial parents to recover their legal expenses in successful child support modification proceedings when these expenses are reasonable and appropriate. *See Deas v. Deas*, 774 S.W.2d 167, 169 (Tenn. 1989); *Dalton v. Dalton*, 858 S.W.2d 324, 327 (Tenn. Ct. App. 1993). Our court will not interfere with these decisions absent a showing of an abuse of discretion. *See McCarty v. McCarty*, 863 S.W.2d 716, 722 (Tenn. Ct. App. 1992).

Mr. Ford has the burden of proving that the evidence does not support the trial court's award of attorney's fees to Ms. Ford. *See Threadgill v. Threadgill*, 740 S.W.2d 419, 426 (Tenn. Ct. App. 1987). He has failed to carry that burden. His argument that Ms. Ford can pay her legal expenses from the lump-sum award of child support he has been ordered to pay overlooks the fact that child support awards are intended to benefit the child, not the parent. The record contains no evidence of either Ms. Ford or Jarrod Ford's financial condition. Accordingly, there is no evidence to support Mr. Ford's contention that the lump sum support award is sufficient to meet the child's needs and to pay Ms. Ford's attorney's fees.

Ms. Ford also requests an additional award to defray her legal expenses on this appeal. As to that request, we disagree with her assertion that Mr. Ford has pursued an unnecessary appeal. In light of our conclusion that the trial court should not have considered the one-time distribution from the Ernest and Betty Ford Life Insurance Trust, we conclude that this appeal has involved more than Ms. Ford merely "vindicating [a] right" to an increase in child support. *Cf. Richardson v. Richardson*, 969 S.W.2d 931, 936 (Tenn. Ct. App. 1997). Mr. Ford's appeal was "partially successful," *see Young v. Young*, 971 S.W.2d 386, 393 (Tenn. Ct. App. 1997), and, therefore, we deny Ms. Ford's request for an award of her attorney's fees and costs on appeal.

## IV.

We affirm the judgment as modified herein and remand the case to the trial court for the entry of an order setting out Mr. Ford's monthly child support obligation and calculating his lump-sum child support obligation in accordance with this opinion. We tax the costs of the appeal to Brion Leonard Fabian Ford and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE, M.S.


_____
SAMUEL L. LEWIS, JUDGE