IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 6, 1999 Session

## JOHN M. JUSTICE v. HOLLY HOLMBERG JUSTICE

**Appeal from the Circuit Court for Davidson County**
**No. 96D-2745     Muriel Robinson, Judge**

_____

**No. M1998-00916-COA-R3-CV - Filed February 23, 2001**

_____

This appeal involves a dispute between a physician and a pharmacist regarding the provisions in their divorce decree for spousal support and legal expenses. In its decree ending their fourteen-year marriage, the Circuit Court for Davidson County directed the physician, among other things, to pay the pharmacist $50 per month in alimony in futuro until her death or remarriage, as well as $4,500 to partially defray the legal expenses she had incurred in the divorce proceeding. The physician asserts on this appeal that the spousal support award was punitive and that the pharmacist received sufficient assets as a result of the division of the marital estate to pay her own legal expenses. We have determined that the record supports the trial court's decisions regarding both the spousal support and the legal expenses and, therefore, affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Jack Norman, Jr. and Phillip Robinson, Nashville, Tennessee, for the appellant, John M. Justice.

Mary Arline Evans, Nashville, Tennessee, for the appellee, Holly Holmberg Justice.

### OPINION

John M Justice and Holly Holmberg Justice were married in August 1984 in Columbia, Nebraska. Dr. Justice was beginning his third year of medical school, and Ms. Justice was beginning her final year of pharmacy school. Ms. Justice assumed the role as the family's breadwinner to allow Dr. Justice to focus on his last two years of medical school. While Dr. Justice was completing his education, Ms. Justice paid for most of the household expenses, including food, clothing, and automobile insurance. She also paid for Dr. Justice's medical textbooks and part of his tuition, as well as the fees for his medical board exams and interviewing expenses.

By choice, Dr. Justice's early medical career centered around clinical and academic medical research. After his graduation from medical school, the parties embarked on a series of moves built around Dr. Justice's career. They first moved from Nebraska to Michigan to enable Dr. Justice to complete a four-year internship and residency at the University of Michigan. Thereafter, the parties moved to Maryland where Dr. Justice held a fellowship at the National Institutes of Health. Eventually, in 1994, the parties moved to Nashville where Dr. Justice began a fellowship in interventional cardiology at Vanderbilt University.

The work that Dr. Justice pursued was only modestly remunerative. For example, he received only $37,000 from his Vanderbilt fellowship. He augmented his clinical stipend by working part-time assisting heart surgeons at two local hospitals. He earned approximately $19,000 per year for this work. In the meantime, Ms. Justice aggressively pursued her career as a pharmacist in order to supplement the parties' income because, by 1995, they had three children to support.[1] In 1997, as result of working three jobs, occasionally from 6:30 A.M. to 11:00 P.M., Ms. Justice earned approximately $69,000. During the same year, Dr. Justice earned approximately $56,000. While Dr. Justice was pursuing his residencies and fellowships, he and Ms. Justice discussed how he expected to eventually start a private medical practice with an estimated $300,000 annual income. Their hope was that Ms. Justice would be able to stop working to concentrate on their family when Dr. Justice entered private practice.

Marital problems dashed the parties' hopes for a happy marriage and a well-rounded family life. Dr. Justice's alcohol abuse plagued them throughout most of the marriage. Ms. Justice described Dr. Justice as a "mean, nasty drunk" when he abused alcohol. To complicate the relationship even further, Dr. Justice also engaged in two extramarital affairs after the parties moved to Nashville. The first, brief affair occurred in 1995. The second, more serious affair started later and eventually prompted Dr. Justice to separate from Ms. Justice and to move out of the family home.

In September 1996, Dr. Justice filed suit in the Circuit Court for Davidson County seeking an irreconcilable differences divorce. Ms. Justice later counterclaimed for divorce on the grounds of adultery, habitual drunkenness, inappropriate marital conduct, and irreconcilable differences. She also counterclaimed for battery and deceit because she believed that she had contracted a sexually transmitted disease from Dr. Justice that he had picked up from his girlfriend. By the time of the trial, the parties had agreed that Ms. Justice was entitled to a divorce on the grounds of inappropriate marital conduct and adultery and that Ms. Justice should have sole custody of the parties' three children. They also agreed on most of the division of their marital estate. Thus, the trial focused on the issues of child support, spousal support, and Ms. Justice's battery claim.

---

[1] The parties' first child was born in 1989; their second in 1991; and their third in 1995.

Following a hearing in March 1998, the trial court entered a final divorce decree awarding Ms. Justice a divorce on the grounds of inappropriate marital conduct and adultery. The trial court also gave sole custody of the parties' three children to Ms. Justice and directed Dr. Justice to pay $1,393 in monthly child support and awarded Ms. Justice approximately 75% of the parties' $217,000 marital estate. In addition, the trial court ordered Dr. Justice to pay Ms. Justice $50 per month in long-term spousal support until her death or remarriage and directed Dr. Justice to pay Ms. Justice an additional $4,500 to defray the legal expenses she had incurred in the divorce proceeding. Finally, the trial court dismissed Ms. Justice's battery claim. On this appeal, Dr. Justice takes issue with the award for spousal support and the additional award for Ms. Justice's attorney's fees.

## I.
### THE SPOUSAL SUPPORT AWARD

We turn first to Dr. Justice's contention that the trial court improperly awarded monthly spousal support to Ms. Justice. There are no hard and fast rules for spousal support decisions. *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998); *Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. Ct. App. 1996). Instead, trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount, and duration. *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000); *Sannella v. Sannella*, 993 S.W.2d 73, 76 (Tenn. Ct. App. 1999). Appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes. *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998); *Young v. Young*, 971 S.W.2d 386, 390 (Tenn. Ct. App. 1997).

Tenn. Code Ann. §36-5-101(d)(1) (Supp. 2000) reflects a preference for temporary, rehabilitative spousal support, as opposed to long-term support. *Crabtree v. Crabtree*, 16 S.W.3d at 358; *Goodman v. Goodman*, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999); *Herrera v. Herrera*, 944 S.W.2d 379, 387 (Tenn. Ct. App. 1996). The purpose of rehabilitative support is to enable the disadvantaged spouse to acquire additional job skills, education, or training that will enable him or her to be more self-sufficient. *Smith v. Smith*, 912 S.W.2d 155, 160 (Tenn. Ct. App. 1995); *Cranford v. Cranford*, 772 S.W.2d 48, 51 (Tenn. Ct. App. 1989). On the other hand, the purpose of long-term spousal support is to provide support to a disadvantaged spouse who is unable to achieve some degree of self-sufficiency. *Loria v. Loria*, 952 S.W.2d 836, 838 (Tenn. Ct. App. 1997). The statutory preference for rehabilitative support does not entirely displace other forms of spousal support when the facts warrant long-term or more open-ended support. *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995); *Isbell v. Isbell*, 816 S.W.2d 735, 739 (Tenn. 1991).

Decisions whether to award spousal support, as well as decisions regarding the amount and duration of spousal support, hinge on the unique facts of each case and require a careful balancing of the factors embodied in Tenn. Code Ann. § 36-5-101(d)(1). *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999); *Sannella v. Sannella,* 993 S.W.2d at 76. In most cases, the two most important factors listed in Tenn. Code Ann. § 36-5-101(d)(1) are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Anderton v. Anderton*, 988 S.W.2d at 683; *Umstot v. Umstot*,

968 S.W.2d 819, 823 (Tenn. Ct. App. 1997). Of those two factors, the disadvantaged spouse's needs are the threshold consideration. *Aaron v. Aaron*, 909 S.W.2d at 410; *Watters v. Watters*, 22 S.W.3d at 821.

As far as Dr. Justice is concerned, Ms. Justice is not entitled to spousal support because her income has equaled or exceeded his throughout the marriage. He asserts that the essentially undisputed evidence regarding the parties' incomes between 1984 and 1997 demonstrates that Ms. Justice does not need spousal support. Based on his belief that Ms. Justice does not need spousal support, Dr. Justice complains that the trial court was plainly punishing him by ordering him to pay Ms. Justice $50 per month. While we do not condone punitive spousal support awards, *Anderton v. Anderton*, 988 S.W.2d at 682; *Kinard v. Kinard*, 986 S.W.2d at 234, we do not share Dr. Justice's belief that this particular spousal support award was punitive.

Dr. Justice's argument that Ms. Justice has absolutely no need for spousal support cannot withstand scrutiny. While it may be true that her earnings exceeded his in 1997, the spreadsheet does not tell the whole story. In 1997, Ms. Justice was working at three jobs, sometimes as many as sixteen hours a day, in order to earn money to support the family. At the same time, Dr. Justice was pursuing his interest in medical research rather than practicing medicine in his speciality. Dr. Justice was able to indulge his interest in relatively low-paying medical research solely because of Ms. Justice's efforts.

Even as the parties were divorcing, Dr. Justice was poised to complete his work as a medical researcher and to enter the private practice of medicine where he will be able to parlay his specialty training and skills into a medical practice where he can earn between $150,000 and $300,000 annually. Ms. Justice, on the other hand, faces a different future. She will no longer be married to the person for whom she sacrificed for almost fourteen years. She will be a single mother responsible for raising three children under eleven years of age. She will still be a pharmacist, but with her responsibilities to her children, Ms. Justice will not be able to juggle three different jobs or work sixteen-hour days.

In light of these facts, we find that there is little practical likelihood that Ms. Justice will, on her own, ever be able to be much more than basically self-sufficient. She is trained as a pharmacist, but her income as a pharmacist will never approach the combined income that she and Dr. Justice earned while they were married, and it will certainly never approach the income that Dr. Justice can reasonably be expected to earn as a practicing physician. Thus, taking the factors in Tenn. Code Ann. § 36-5-101(d)(1)(A), (B), (F), (G), (H) into account, we find that Ms. Justice is financially disadvantaged in comparison to Dr. Justice. Because of this relative financial disadvantage, we concur with the trial court's conclusion that Ms. Justice is entitled to spousal support.

We must now determine the type, amount, and duration of spousal support that Ms. Justice should receive. After weighing the evidence pertaining to Tenn. Code Ann. § 36-5-101(d)(1)(C), (F), (J), (K), we share the trial court's conclusion that Ms. Justice is entitled to long-term, rather than rehabilitative alimony. Her contributions during the marriage have been considerable, and the record

does not provide any basis for concluding that she precipitated or contributed to the break-up of the parties' marriage. Thus, she is entitled to the "closing-in money" approved by the Tennessee Supreme Court that will enable her "to more closely approach her former economic position." *Aaron v. Aaron*, 909 S.W.2d at 411. The amount and duration of this "closing-in money" requires balancing Ms. Justice's needs, Dr. Justice's current ability to pay, the duration of the marriage, the relative fault of the parties, their age and health, and their assets and separate property.

We do not construe the trial court's decision to require Dr. Justice to pay Ms. Justice $50 per month in spousal support as an indication that the trial court determined that Ms. Justice needs or is entitled to only $50 per month. Rather, we conclude that the trial court determined that Dr. Justice would only be able to pay $50 in monthly spousal support during his fellowship at Vanderbilt. In light of the proof of Dr. Justice's professional prospects, the trial court must have determined that he would later be able to provide more spousal support and that Ms. Justice should be entitled to additional support in light of her contributions to Dr. Justice's education and her financial contributions to the family during the marriage.

Spousal support is not necessarily intended to provide a spouse with a permanent profit-sharing plan. *Russell v. Russell*, No. 03A01-9305-CV-00195, 1993 WL 523464, at *3 (Tenn. Ct. App. Dec. 16, 1993) (No Tenn. R. App. P. 11 application filed); *see also Calderwood v. Calderwood*, 327 A.2d 704, 706 (N.H. 1974); *Snyder v. Snyder*, 212 N.W.2d 869, 875 (Minn. 1973). However, to avoid depriving a spouse of the right to obtain spousal support in the future if there is a need for it, many courts have approved the practice of awarding a nominal amount of alimony in the final decree in order to retain jurisdiction to alter the amount later if the circumstances warrant it. *E.g., Becker v. Becker*, 262 N.W.2d 478, 484 (N.D. 1978); *Schwandt v. Schwandt*, 471 N.W.2d 176, 177 (S.D. 1991). These awards are appropriate when there is some uncertainty about one party's present or future finances, health, or earning power. *Holstein v. Holstein*, 412 S.E.2d 786, 790 (W. Va. 1991); *overruled on other grounds*, *Banker v. Banker*, 474 S.E.2d 465, 476 (W. Va. 1996). Thus, they have been employed when there is uncertainty regarding the future needs of the disadvantaged spouse, *Bell v. Bell*, 641 S.W.2d 854, 856 (Mo. Ct. App. 1982); *Griffin v. Griffin*, No. 02A01-9807-CH-00177, 1999 WL 1097849 at *5 (Tenn. Ct. App. Oct. 30, 1999) (No Tenn. R. App. P. 11 application filed), or when the obligor spouse's income potential has not been fully realized. *E.g., Blanchard v. Blanchard*, ___ So. 2d ___, ___ (Fla. Dist. Ct. App. 2001);[2] *Spencer v. Spencer*, 720 A.2d 1159, 1162-63 (Me. 1998).

Like other awards for spousal support, awards of nominal support for the purpose of retaining jurisdiction are discretionary with the trial court. *Ridolfi v. Ridolfi*, 423 A.2d 85, 87 (Conn. 1979); *Richardson v. Richardson*, 524 S.W.2d 149, 153 (Mo. Ct. App. 1975); *Lee v. Lee*, 744 P.2d 1378, 1382 (Utah Ct. App. 1987). When trial courts determine that the facts warrant a nominal support award, they should make sure that their reasons for making the award are included in the record.

---

[2]*Blanchard v. Blanchard*, No. 2D00-179, 2001 WL 109181, at *2 (Fla. Dist. Ct. App. Feb. 9, 2001).

Based on the facts of this case, we cannot fault the trial court's decision to require Dr. Justice to pay Ms. Justice $50 per month in spousal support until her death or remarriage.[3]

## II.
### THE AWARD FOR LEGAL EXPENSES

Dr. Justice also takes issue with the trial court's decision to order him to pay $4,500 of the $6,452.50 in legal expenses Ms. Justice incurred as a result of the divorce litigation. Awards of attorney's fees in these circumstances are treated as spousal support. *Sannella v. Sannella*, 993 S.W.2d at 77; *Ford v. Ford*, 952 S.W.2d 824, 830 (Tenn. Ct. App. 1996); *Herrera v. Herrera*, 944 S.W.2d at 390. In determining whether to award attorney's fees, the trial court should again consider the relevant factors in Tenn. Code Ann. § 36-5-101(d). *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992). Appellate courts will ordinarily not interfere with the trial court's discretion in awarding fees as support without a showing of manifest abuse of discretion. *Hanover v. Hanover*, 775 S.W.2d 612, 618 (Tenn. Ct. App. 1989); *Lyon v. Lyon*, 765 S.W.2d 759, 763 (Tenn. Ct. App. 1988).

Dr. Justice correctly points out that Ms. Justice received assets as part of the division of the parties' marital estate and that the amount of the liquid assets she received would be more than sufficient to pay her legal expenses. However, Dr. Justice overlooks the decisions in which we have held that spouses who receive sufficient assets to pay their legal expenses may still be entitled to an additional award for these expenses to avoid requiring them to deplete these assets. *Brown v. Brown*, 913 S.W.2d 163, 170 (Tenn. Ct. App. 1994); *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). Based on this record, we have concluded that the trial court did not err by declining to require Ms. Justice to use the property she received in the division of marital property to pay her legal expenses.

The remaining question concerns the amount of legal expenses that Dr. Justice should be required to pay in light of the trial court's dismissal of Ms. Justice's battery claim. The trial court must have taken this into account because it awarded Ms. Justice only $4,500 of her claimed $6,452.50 legal expenses. Our independent examination of the affidavit submitted by Ms. Justice's lawyer to support her request for fees satisfies us that the trial court adequately discounted the costs Ms. Justice incurred relating to her unsuccessful battery claim. Accordingly, we find that the trial court did not err by awarding Ms. Justice an additional $4,500 for her legal expenses.

---

[3]We have affirmed the amount and duration of the spousal support award on the presumption that the trial court intended to leave the door open to permit Ms. Justice to seek a modification should Dr. Justice enter private practice and should his financial circumstances markedly improve. Should Ms. Justice request an increase in support at some point in the future, the amount and duration of her support must be determined in light of the circumstances then existing. Our opinion should not be construed to hold that Ms. Justice will be, in any circumstance, entitled to increased spousal support until her death or remarriage. If this matter is reopened, the trial court must set a reasonable duration for Dr. Justice's support obligation.

**III.**

We affirm the final divorce decree and remand the case to the trial court for whatever further proceedings may be required. We tax the costs of this appeal to John M. Justice and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE