IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 19, 2008 Session

**CHARLES EDWARD CARPENTER, SR.**
**v.**
**MARY ALICE BOBO CARPENTER**

**An Appeal from the Circuit Court for Shelby County**
**No. CT-003207-05     Allen W. Wallace, Judge**

_____

**No. W2007-00992-COA-R3-CV - Filed December 31, 2008**

_____

This is a divorce case. The parties had a long-term marriage and enjoyed a high standard of living. The parties then filed for divorce. At the conclusion of the trial, the trial court adopted the wife's proposal for the distribution of marital property and ordered the husband to pay the wife substantial alimony *in futuro* and attorney's fees. The husband now challenges the distribution of marital property as well as the award of alimony and attorney's fees. Regarding the distribution of the marital estate, the husband argues that the trial court overvalued his law practice, undervalued the wife's counseling business, and failed to give the husband credit for several tax liabilities that he assumed. He further argues that the trial court awarded the wife an excessive amount of alimony and attorney's fees. We affirm in part as modified, determining that the facts as found by the trial court were supported by a preponderance of the evidence, and that the trial court did not abuse its discretion in the distribution of marital property and award of alimony. We reverse the award of attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is**
**Affirmed in Part, Reversed in Part, and Modified**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Robert L. J. Spence, Jr., Memphis, Tennessee, for the appellant, Charles Edward Carpenter, Sr.

Daniel Loyd Taylor and John N. Bean, Memphis, Tennessee, for the appellee, Mary Alice Bobo Carpenter.

# OPINION

## FACTS AND PROCEEDINGS BELOW

Plaintiff/Appellant Charles Edward Carpenter, Sr. ("Husband"), and Defendant/Appellee Mary Alice Bobo Carpenter ("Wife") were married on August 4, 1979. They had two children, both of whom are now adults.[1] Sometime in 2002, Husband began having an extramarital affair. In June 2005, after twenty-seven years of marriage, Husband filed a complaint for divorce. Soon thereafter, Wife filed an answer and a counterclaim for divorce, asserting Husband's adultery as grounds.

On December 19, 2006, the trial was conducted in this matter. At the time of trial, Husband was fifty-four (54) years old and Wife was fifty-three (53) years old. The testimony and evidence at trial related primarily to the valuation and division of marital assets and spousal support.

The background facts are generally undisputed. The parties dated for nine years, then married just after Husband graduated from law school. Husband established his law practice as a sole practitioner, and his work involved both criminal and civil litigation. In the fall of 1991, he began to focus his law practice on municipal finance and bond work, with legal fees generated on a contingent fee basis. At the time of trial, Husband had one associate attorney in his office, but was the sole owner of his law practice, a professional corporation. Wife earned her graduate degree in social work during the marriage and became a licensed clinical social worker. In 1992, she opened her own consulting business called Healthy Connections Consulting, which is still in operation.

In 1992, the parties purchased an office building located at 386 Beale Street ("Beale Street property") in Memphis, Tennessee. Both operated their businesses out of this building. In 1993, Husband's law firm leased the entire premises and paid the parties $6,000 per month in rent. Wife's business utilized one office and a small storage space, and it paid no rent. In April 2006, after the parties' relationship had become acrimonious, Husband filed a forcible entry and detainer action against Wife in a separate proceeding, seeking to force Wife to move her business out of the Beale Street building. Husband prevailed, and Wife moved her business to another location. In the new location, Wife's business was required to pay a monthly lease expense.

Husband testified that he and Wife initially separated sometime prior to 2000, but later attempted reconciliation. In 2000, they purchased a 5,600 square-foot home with a five-car garage in a subdivision known as "Southwind" ("the marital home"). Despite the reconciliation attempt, Husband and Wife began to live separate lives. Husband said that he began a personal relationship with Darlene McDonald ("McDonald"), a Nashville resident, in 2003. He acknowledged, however, that in January 2002, he had bought airline tickets to Orlando, Florida, for him and McDonald for a March 2002 trip. Over the course of their relationship, Husband bought McDonald dinners, event tickets, and airline tickets to meet him on business trips. In his testimony, Husband submitted copies

---

[1]When the divorce decree was entered, the parties' youngest child was a few months away from his eighteenth birthday. This appeal does not involve issues concerning the support or custody of the parties' children.

of credit card bills documenting these purchases, which totaled about $7,070. Husband testified further that he made two $2,000 loans to McDonald; one was paid back and the other was forgiven. Husband also bought McDonald a $1,200 computer and a cell phone, and made payments for her cell phone usage of about $120 per month.

Husband testified about his valuation and proposed distribution of the parties' assets. In accordance with Rule 14(C) of the Local Rules for Shelby County Circuit Court, in advance of trial, Husband filed an affidavit of assets, debts, income, and expenses. According to Husband's affidavit, the parties' marital estate was worth over $1 million. He proposed that it be divided 60% to Wife and 40% to him.

In Husband's affidavit, the marital home was valued at approximately $995,000. The parties owed about $600,000 on it, and the mortgage payments were $5,940 per month. Husband claimed that it was a hardship on him to service the monthly mortgage payment, and his documentation assumed that the house would eventually be sold. When Husband moved out of the marital home, he stayed rent free in his childhood home at 792 East McKellar Avenue, now owned by him and his brothers and sisters. The Beale Street property, valued by Husband at $670,000, was encumbered by two mortgages totaling about $455,000, requiring mortgage payments of about $5,445 per month. Husband proposed that Wife be awarded the marital home, and that he be awarded the Beale Street property, and that the debt associated with each property follow that property. The parties also owned other assets, such as an 18-acre undeveloped lot on Holmes Road worth $180,000, annuities, and investment accounts, and these were included in Husband's proposed overall division of marital property.

The parties disputed the valuation of their businesses. Husband valued his law practice at $33,491. He arrived at this valuation by first estimating the value of the practice's assets, including furniture, $20,000 in art work, fixtures, equipment, accounts receivable, and two vehicles owned by the practice, a 2004 Expedition and a 2002 Ford Thunderbird. All of these assets were estimated to be worth $122,991. From this amount, Husband subtracted his practice's $89,500 debt to arrive at the $33,491 valuation. Husband acknowledged, however, that in bank financial statements submitted in years past, he had valued his law practice at $175,000 in 2003 and $200,000 in 2004. In a bank financial statement filed in 2005, after the petition for divorce was filed, Husband valued his law practice at $100,000. Husband valued Wife's business, Healthy Connections, at $20,177. This figure included the business's furniture, fixtures, equipment, accounts receivable, and a 2003 Infinity owned by Wife, less liabilities.

Husband's affidavit showed that his total income was $20,421 per month. This amount included $5,788 ($8,000 less $2,212 in withholding/taxes) per month in salary from the law firm, $3,000 from his half of the rent paid by the law firm on the Beale Street property, and $11,633 per month in draws from his law firm in 2006. Husband testified that the fact that his law practice generates contingent fees rather than hourly fees frequently results in cash flow problems. The monthly draws from his law firm help him meet his ongoing expenses. Husband said that, in 2005 and 2006, he accrued significant tax liability; by the time of the trial, it totaled over $76,000.

-3-

Husband's affidavit also showed that he has approximately $83,500 in debts from his personal credit cards and a line of credit. Husband estimated that his personal expenses totaled approximately $22,080 per month. After taxes, this left him with a deficit of $1,660 each month. Considering the monthly mortgage payments on the marital home and the Beale Street property along with his other debts, Husband described himself as going deeper into debt each month. Though his siblings had allowed him to live in the McKellar Avenue home rent free for about a year and a half, Husband anticipated that he would soon need to make rental payments.

Husband and Wife had two separate bank accounts. From time to time, Husband said, Wife would use the funds in her account for family expenditures, and then submit a request to Husband for reimbursement. The expenditures for which Wife sought reimbursement included the children's haircuts, clothes, vitamins, doctor's visits, eyeglasses, and groceries.

To probe Husband's claim that his cash flow was insufficient, Husband was asked on cross-examination about certain extraordinary expenditures incurred between 2001 and 2004. From 2001 to 2005, Husband paid about $50,000 per year for his older son's college education and living expenses. Between November 2002 and June 2004, Husband spent about $15,370 on men's clothing, and in 2004, he paid $9,818 for Memphis Grizzlies basketball tickets. During that time, he contributed $1,280 per month to his 401(k) retirement account and $1,000 per month to his New York Securities brokerage account. In addition, Husband testified, he paid 100% of the family's household expenditures. He explained that, during this time period, he met some of his financial obligations by canceling $174,000 in life insurance policies, and by occasionally using funds in his New York Securities Brokerage account. Husband also said that, during this time, he was healthy and his law practice was good, but that things had since changed for the worse.

Additionally, Husband testified that, in the first eleven months in 2006, his law firm showed a profit of $46,000 over and above the $128,000 in draws he had received over the year. Two weeks prior to trial, Husband testified in his deposition that he expected to receive about $121,000 in fees in December 2006, in addition to the profit he had reported. At trial, however, Husband said that those fees were not going to be paid in 2006, and that he did not know when they would be paid.

Wife also testified at trial. She said that she and Husband began having problems in their relationship in 2000, at a time when he was traveling extensively. In 2005, Wife discovered that Husband had been having a romantic relationship with McDonald, and the parties separated. Wife testified that, from the information in Husband's American Express bills, he had spent $16,026 on McDonald for travel and other expenses. Wife submitted a list itemizing those purchases at trial.

Wife testified about her business, Healthy Connections Consulting. In the Beale Street building, Wife's business used one office and a small storage area rent free, but she paid her own telephone and fax bills. Healthy Connections' two primary sources of income were the State of Tennessee Children's Fund, a state entity providing services for at-risk children, and commercial insurance business, working for companies to provide counseling services to employees and their

-4-

families. Wife said that, after 2006, she expected to lose business from the State Children's Fund because of a shortage of State funds.

After Wife discovered Husband's infidelity, it became difficult for the parties to both operate their businesses out of the same location. In March 2006, after she was ordered to relocate her business, she moved to an office space of 830 square feet, incurring moving expenses of $7,527. After the move, Wife said, she lost a great deal of business and also became obligated to pay rent.

Like Husband, Wife filed a Rule 14(C) affidavit of income and expenses in advance of trial. The affidavit shows that, in the first eleven months of 2006, Wife earned $3,682 per month gross income and $2,625 per month net income. She estimated that, given her personal living expenses, she would have a monthly deficit of $9,583. Her estimated expenses included payments on over $78,000 in credit card debts, some of which was attorney's fees. Wife claimed that Husband alone received the $6,000 in rent paid by the law firm on the Beale Street property, and that she never received any of those rental payments. She asserted that Husband's income had always far exceeded her income, and said that she would never be able to earn an amount "anywhere near" Husband's income. On Wife's 2005 separate tax return, she reported business income of $70,851, and adjusted gross income of $63,845. She said that Husband paid for all of the family expenses, and that he never had a problem making college payments, house payments, or insurance premiums. When Wife spent her own money on the children or on other family expenses, she sought reimbursement from Husband. When she did so, he required that she give him a list itemizing her purchases.

In accordance with Rule 14(D) of the Shelby County Local Rules, Wife filed a Rule 14(D) memorandum proposing that Husband be required to pay her $6,000 per month in alimony *in futuro*, along with homeowner's insurance and taxes, until the sale of the marital residence. After the sale of the marital residence, she proposed, Husband should be required to pay her $5,000 per month in alimony *in futuro*, to terminate upon the death of either party or upon Wife's remarriage.

Attached to Wife's Rule 14(D) memorandum was her proposed division of marital assets and liabilities. Wife valued Husband's law practice at $200,000, and valued her own business at zero. Wife explained that her practice had no value except for "probably [her] furniture." Wife proposed that she receive 53% of the marital assets, and that Husband receive 47%. As to the marital debt, she proposed that she be responsible for $78,000 owed on the credit cards primarily used by her, and that Husband be responsible for $151,633 in marital debt.[2] This proposal would result in Husband being assigned 66% of the marital debt, and Wife being assigned 34%.

Wife asked that Husband be required to pay her attorney's fees and expenses incurred in the litigation. She testified that she paid $21,300 to her original attorneys and that she made those payments by using her credit cards. These original attorneys handled the eviction action filed by Husband on the Beale Street building. She also requested $29,414 in fees for her trial attorney for services provided through the time period just before trial. This concluded the evidence at trial.

---

[2]Wife also proposed that she maintain the $420 monthly debt on the timeshare property that she would receive.

Several months later, on April 20, 2007, the trial court entered a final decree, granting Wife a divorce based on Husband's inappropriate marital conduct. The trial court determined that Husband's relationship with McDonald predated January 2002, that this relationship was the reason for the deterioration of the marriage, and that Wife was an innocent spouse. After considering each party's Rule 14 filings, the trial court adopted Wife's Rule 14(D) filing without further explanation except with respect to alimony, dissipation of marital assets, and allocation of frequent flyer miles. The trial court awarded Wife alimony *in futuro* in the amount of $5,500 per month for ten (10) years, and thereafter $4,000 per month until Wife remarries, cohabits with another man, or dies. The alimony award was based on several factors, including the duration of the marriage, Husband's substantial income, and Husband's fault in causing the divorce. The trial court specifically credited the almost $50,000 dissipation of marital assets by Husband listed in Wife's 14(D) memorandum, and charged this amount to Husband. It found further that Wife should receive half of Husband's frequent flyer miles, provided she could qualify for those benefits. Finally, Wife was awarded attorney's fees in the amount of $51,030.51. From this order, Husband now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Husband argues that the trial court abused its discretion in its distribution of marital property, in its award of alimony *in futuro*, and in its award of attorney's fees to Wife. Husband contends that the trial court exhibited improper motivation to punish Husband, evidenced by the trial judge's questioning of Wife and by its comments indicating that Tennessee courts favored the concept of punishment under these circumstances. We shall address each issue in turn.

Because this was a bench trial, we review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the preponderance of the evidence is otherwise.[3] Tenn. R. App. P. 13(d). A reviewing court should give "great weight to the decisions of the trial court in dividing marital assets," and should be "disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)). Trial courts have broad discretion in determining the amount of alimony, if any, and the type of alimony to be awarded in view of the circumstances of each particular case, and such awards will not be disturbed absent an abuse of that discretion. *See Broadbent v. Broadbent*, 211 S.W.3d 216, 219-20 (Tenn. 2006); *Lindsey v. Lindsey*, 976 S.W.2d 175, 180 (Tenn. Ct. App. 1997). Moreover, the trial court is in the best position to assess the demeanor of the witnesses and to make judgments regarding the credibility of these witnesses. To the extent that a trial court's decision was based on witness credibility, we will not reverse that decision absent clear and convincing evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). The trial court's conclusions of law are

---

[3]Husband argues that, because the trial court adopted Wife's Rule 14(D) proposal in a wholesale manner and did not make specific findings of fact, we must review its findings of fact *de novo*, with no presumption of correctness. We decline to change the standard of review, and we review the trial court's decision and its findings of fact in light of the record as a whole.

reviewed *de novo*, with no presumption of correctness. **Keyt**, 244 S.W.3d at 327 (citing *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002)).

ANALYSIS

Husband argues first that the trial court erred in its wholesale adoption of the division of marital assets and liabilities set out in Wife's 14(D) memorandum, asserting that this method of distributing property resulted in several errors. He argues that the trial court gave him no credit for assuming responsibility for various tax liabilities, including his 2005 and 2006 income tax liabilities ($75,730), and for the 2006 city and county property tax liability on the Beale Street property and the undeveloped real property on Holmes Road ($9,766), for a total tax liability of $85,496. Husband argues also that Wife's Rule 14(D) memorandum erroneously undervalued Wife's business, giving it zero value, and overvalued Husband's law practice ($142,695), and that the trial court erred in adopting these figures. Husband claims on appeal that assigning Wife's business a "zero" value was implausible in light of the fact that, at the very least, the business owned artwork and furniture, and he asserts error in the trial court's order that he pay Wife over $9,000 in moving costs for relocating her business. He further argues that the evidence does not support Wife's valuation of his law firm. In sum, Husband argues that the trial court erred in failing to give him credit for assuming the $85,496 tax debt, artificially inflating the value of his law firm by $109,204, and undervaluing Wife's business by $20,178, resulting in a total error in Wife's favor of $214,878. Considering these revised values, Husband asserts, the trial court's distribution of marital assets was actually 30.5% to Husband and 69.5% to Wife, rather than the 47% to 53%, respectively, that the trial court said that it intended. Husband suggests that this inequity can be rectified by awarding him the Charles Carpenter, P.C. 401(k), valued at $64,000, and his Mainstay Fund, valued at $42,086.

In response, Wife maintains that the trial court's adoption of the proposals in her Rule 14(D) filing was proper, and that the valuations in it were supported by a preponderance of the evidence. She argues that the trial court justifiably concluded that Husband's valuation of his business was not credible, and that her valuation was more accurate in light of the bank financial statements in which Husband valued his law firm at $175,000 in 2003, $200,000 in 2004, and $100,000 in 2005. Wife also contends that Husband's valuation of her business was unsupported by the evidence, while her valuation of "zero" was supported by her testimony and other evidence at trial. Regarding tax liabilities, Wife acknowledges that the trial court effectively assigned Husband the income tax debts from 2005 and 2006, because the parties filed separate tax returns in those years. Such an allocation was proper, Wife asserts, because the debt was associated with Husband's income, she was not legally responsible for the debt, and Husband was in the better financial position to pay it. Furthermore, Wife argues, the Beale Street property tax liability was properly allocated to Husband because the property was awarded to him. As for tax liability on the Holmes Road property, Wife concedes that the parties should share the total tax liability of $1,477 as a joint debt, because the property was divided equally between them in the marital property division. She claims, however, that the trial court's entire distribution of the marital estate should not be reversed based on its failure to properly allocate this single debt.

-7-

We begin by addressing the trial court's valuation of the parties' businesses. The valuation of a marital asset is a question of fact, and the trial court's valuation is given great weight on appeal. *Powell v. Powell*, 124 S.W.3d 100, 103 (Tenn. Ct. App. 2003). Such a valuation "is determined by considering all relevant evidence regarding value and the burden is on the parties to produce competent evidence of value." *Id.* at 104. When a trial court is faced with valuing a spouse's profession for purposes of making an equitable division of that property, the court must take into account the physical assets of the business that have ascertainable value (furniture, real estate, art work, etc.) as well as the business's accounts receivable. Generally, the value does not include good will. *See Smith v. Smith*, 709 S.W.2d 588, 591 (Tenn. Ct. App. 1985). "If the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence." *Powell*, 124 S.W.3d at 105-06.

In this case, the evidence regarding the value of Husband's law firm is conflicting. Husband valued his law firm at $33,491. This figure was supported by Husband's own testimony and his affidavit listing the firm's assets and liabilities. He testified that these figures were corroborated by reports generated by his accounting firm, but those reports were not included in the record on appeal. Wife's valuation of Husband's law firm at $142,695 was based in large part on the bank financial statements filed by Husband in 2003, 2004, and 2005, valuing the firm at $175,000, $200,000, and $100,000, respectively. (Exh. 13, 14, 15). The $142,695 value was derived by assuming $200,000 in assets, minus $57,305 in debts from Husband's three business credit cards.

The financial statements upon which Wife relies are competent evidence of the value of Husband's law practice. *See id.* at 105. Indeed, Husband's own testimony supported Wife's assertion that the value of Husband's law firm in 2006 was substantially more than his $33,491 valuation. Two weeks prior to trial, Husband testified in his deposition that he expected to receive about $121,000 in fees in December 2006. At trial, Husband testified that he no longer expected to receive these fees in 2006, and indicated that the payments were deferred indefinitely. The accounts receivable in Husband's Rule 14(C) affidavit were listed at only $13,900, so it appears that this anticipated income was not included in Husband's calculations. Moreover, Husband's professed profits in 2006, as well as the previous bank statements reflecting a much higher value, may indicate why the trial judge did not credit Husband's valuation of his law practice. To some extent, the trial court's decision was based on its credibility determination in favor of Wife. We will not reverse the trial court's credibility determinations absent clear and convincing evidence to the contrary. *Id.* Therefore, because Wife's valuation of Husband's law firm was within the range of values supported by the evidence, we affirm the trial court adoption of Wife's proposed value for Husband's law practice. *See Brown v. Brown*, No. 36, 1990 WL 140912 (Tenn. Ct. App. Oct. 1, 1990).

The evidence regarding the valuation of Wife's business was conflicting as well. Husband asserted in his Rule 14(C) affidavit that Wife's business is worth $20,177.85, including furniture, fixtures, a bank account, her car note, her monthly rent, and an average of Wife's 2005/2006 accounts receivable, minus her accounts payable. When asked about this valuation at trial, Husband testified that it was his "best guess" of the business's value from documents provided to him by Wife. Wife's valuation of "zero" was supported by her own testimony that the only value in the

-8-

business was "probably [her] furniture." She claimed that the pieces of art in her office were not business assets, but instead were all gifts to her. The trial court's "zero" valuation of Wife's business was further supported by the 2003, 2004, and 2005 bank financial statements, mentioned above, which did not list Wife's business as an asset of the parties. The trial court could reasonably find that the failure to list Wife's business as an asset indicates that the business had little or no value.

We note that the only underlying documents regarding the valuation of Wife's business in the record on appeal are the 2003, 2004, and 2005 bank financial statements. Considering the evidence, or lack thereof, and the testimony at trial regarding the valuation of Wife's business, we must conclude that the evidence preponderates in favor of the trial court's adoption of Wife's "zero" valuation of her business. Even if we accepted the assertion that the furniture in Wife's office had "some value" up to $4,500, the trial court's failure to specifically account for this amount as an award of marital property to Wife is inconsequential considering the overall size of the marital estate. Additionally, as with the valuation of Husband's law firm, the trial court's valuation of Wife's business rested to some extent on the credibility of the parties. To this extent, we must affirm the trial court's findings absent clear and convincing evidence to the contrary. *Powell*, 124 S.W.3d at 105. Therefore, we find that the trial court's "zero" valuation of Wife's business was within the range of values supported by the evidence.

Husband's final challenge to the property division is the trial court's failure to account for the $85,496 in tax liabilities allocated to Husband, which resulted in an unintended and unfair distribution of the parties' marital debts. Marital debts are "all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). The income taxes and the property taxes to which Husband refers certainly constituted marital debt, because the taxes accrued during the marriage. *See Eganey v. Eganey*, No. M2005-01755-COA-R3-CV, 2006 WL 3740792 (Tenn. Ct. App. Dec. 19, 2006). Both parties agree that, by failing to address these debts in its final decree, the trial court effectively assigned these tax liabilities to Husband. *See, e.g., Brooks v. Carter*, No. 02A01-9409-CV-00225, 1999 WL 43278 (Tenn. Ct. App. Feb. 2, 1999); *Economides v. Economides*, No. 002A01-9109-CV-00189, 1994 WL 95870 (Tenn. Ct. App. Mar. 24, 1994). Therefore, we must determine whether the trial court erred in allocating 100% of these debts to Husband in light of the overall division of marital property. *See Eganey*, 2006 WL 3740792, at *5.

When equitably distributing marital debt, the trial court must consider four factors: (1) the party who incurred the debt; (2) the debt's purpose; (3) the party who benefitted from incurring the debt; and (4) the party who is in a better position to repay the debt. *See id.* "A careful application of these factors will insure the fairest allocation of debt." *Alford*, 120 S.W.3d at 814.

Regarding the income taxes, some of these factors weigh in favor of assigning the debt to Husband; these taxes were incurred by him on his separate tax return, and the income from which these taxes arose provide him the resources with which to pay this debt. On the other hand, Husband correctly notes that his 2005 and 2006 income benefitted both parties, because it was used to support the family and maintain the marital assets. Overall, however, we must find that the relevant factors

weigh in favor of the trial court's implicit assignment of this marital debt to Husband, as he was primarily responsible for generating the debt, and the income upon which the debt is based gives him the ability to pay it. The same factors weigh in favor of the trial court's implicit assignment of the 2006 property taxes on the Beale Street property to Husband. He was awarded this asset, and marital debts should, where possible, follow their associated assets. *See King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998). Regarding the Holmes Road property, however, Wife concedes that she should be responsible for her proportionate share of the property taxes. Therefore, the trial court's decision is modified to require that Wife be responsible for half of the property taxes on the Holmes Road property. Otherwise, the allocation of the parties' tax liabilities is affirmed.

Husband insists that, because the tax liabilities were not explicitly accounted for in the marital property distribution, the trial court erroneously, and perhaps unwittingly, allocated a disproportionate amount of the marital property to Wife. This argument is undercut by our rejection of Husband's argument on the valuation of the parties' businesses. Nevertheless, we must consider the allocation of the tax debt as part of the overall distribution of the martial estate. Factoring in the tax liability allocated to Husband, in light of the size of the estate and the amount of marital assets awarded to each party, we find that the property division was neither unfair nor disproportionate, and that the evidence does not preponderate against the trial court's distribution of the marital property.

Husband next challenges the alimony awarded to Wife. In assessing the nature, amount, duration, and manner of payment of alimony, the court must consider all relevant factors, including:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
> (3) The duration of the marriage;
> (4) The age and mental condition of each party;
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
> (7) The separate assets of each party, both real and personal, tangible and intangible;
> (8) The provisions made with regard to the marital property;
> (9) The standard of living of the parties established during the marriage;
> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (2005). When an award of alimony is appropriate under this section, a court may award any of four types of alimony: rehabilitative alimony, transitional alimony, alimony *in futuro*, and alimony *in solido*. Tenn. Code Ann. § 36-5-121(d)(1). Rehabilitative alimony is temporary support and maintenance granted in order to allow the disadvantaged spouse "to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." Tenn. Code. Ann. § 36-5-121(e)(1). Transitional alimony may be awarded when the court finds that "rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded . . . ." Tenn. Code Ann. § 36-5-121(g)(1).

Though rehabilitative alimony is preferred, long-term support may be appropriate were there is economic disadvantage to one spouse and rehabilitation is not feasible. ***See Crabtree v. Crabtree***, 16 S.W.3d 356, 358 (Tenn. 2000). Long-term support can be awarded in the form of either alimony *in futuro*, which is open-ended support, or alimony *in solido*, which is a definite sum of alimony paid in a lump sum or over time in installments. Tenn Code. Ann. § 36-5-121(f), (h). In the instant case, the trial court awarded Wife alimony *in futuro*, which is authorized under Tennessee Code Annotated § 36-5-121(f)(1):

(f)(1) Alimony *in futuro*, also known as periodic alimony, is a payment of support and maintenance on a long term basis or until death or remarriage of the recipient. Such alimony may be awarded when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, ***meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse,*** considering the relevant statutory factors and the equities between the parties.

T.C.A. § 36-5-121(f)(1) (2005) (emphasis added).

In this appeal, Husband argues that the trial court erred in awarding Wife alimony *in futuro* of $5,500 per month for ten (10) years, and $4,000 per month thereafter. He asserts that, as a matter of law, Wife is not eligible for alimony *in futuro* because she is not economically disadvantaged compared to Husband and is not in need of rehabilitation. Husband claims that, since 1992, Wife has owned and operated a successful psychological counseling business with gross receipts for 2005

in excess of $130,000. He argues that Wife's claimed net income of $2,625.74 per month is "either inaccurate or out of date," and contends that her psychological consulting business has grown to a point at which she has significant contracts with the State and has funding from commercial insurance and employee assistance programs. Husband also points out that the trial court awarded Wife a substantial portion of the marital estate, which militates against a finding that Wife is economically disadvantaged. Specifically, Wife was awarded the equity in the marital home ($395,426) and the parties' investment accounts ($122,703), which together would produce significant monthly income for Wife if the proceeds were invested at a conservative rate of return. Rehabilitation is unnecessary, Husband claims, because Wife has earned her master's degree and is a licensed social worker, enabling her to earn significant and reliable income. Husband acknowledges that he has greater income than Wife, but emphasizes that his correlating tremendous financial obligations make it difficult for him to sustain such a substantial alimony obligation. He argues that divorcing parties often lack sufficient income or assets to enable both of them to retain their pre-divorce standard of living, and that alimony *in futuro* should not be used to guarantee that the recipient spouse will forever be able to enjoy a lifestyle equal to that of the obligor spouse. Considering Wife's lack of need and his lack of ability to pay, Husband argues, the trial court erred in awarding Wife alimony *in futuro*.

In response, Wife notes that the trial court's findings of fact, as expressed in its final decree, are entitled to great deference on appeal, and she argues that its award of alimony *in futuro* is supported by the evidence at trial. Wife claims that she is clearly an economically disadvantaged spouse under the statute because, without alimony payments, she would be "unable to achieve, with reasonable effort, an earning capacity that will permit [her] standard of living . . . to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse . . . ." She notes that the parties enjoyed a very high standard of living during their marriage, living in a $995,000 home, spending $50,000 each year for four years for one child's education, and spending considerable monies on clothes, vacation homes, and other luxuries. She contends that, in such a situation, spousal support may be awarded to provide "closing in" money to enable the disadvantaged spouse to more closely approach the parties' former economic position. She will need this alimony, she argues, to meet a part of her projected $12,209 per month in personal expenses. Wife acknowledges that she was awarded a substantial amount of marital property, but notes that the majority of it consisted of real estate and retirement accounts, and she claims that any potential funds she might receive from these interests are speculative. In light of Husband's admitted income of well over $20,000 per month, Wife claims, Husband has the ability to pay the alimony awarded, and the alimony is necessary to enable her to maintain a standard of living closer to that which she enjoyed during the marriage.

In its final decree, the trial court made specific findings of fact in support of its alimony award:

> (1) Alimony, or spousal support: In awarding periodic alimony, factors to be considered are duration of the marriage, financial resources, the parties' separate assets, the manner in which the marital property was divided, and the parties' relative

fault.  Spousal support awards are not intended to be punitive but, recognizing that, divorce should not inflict undue economic hardship on an innocent spouse.  At the same time the Court has to base such decision on factors set forth in T.C.A. § 36-5-10(d)(1) [sic].

        In this case, this is a 27-year marriage, and the Wife is certainly an innocent spouse.  She complains of certain medical problems, but does not corroborate such complaints with expert medical proof.  Husband's financial resources are substantial and expect to continue to be substantial.  Wife's standard of living to which she is accustom[ed] should be substantially maintained.  The Wife also has the ability to earn a reasonably good income, while certainly not as great as Husband.  She has a master's degree in her chosen field of work.  She is 53 years of age.  Considering the above factors, she is awarded alimony *in futuro* in the amount of $5,500 per month for a period of 10 years, and thereafter $4,000 per month until she remarries, cohabits with another man or her death.

Thus, mindful of the fact that Wife has earned a master's degree and has the ability to earn a "reasonably good income," the trial court found that "Husband's resources are substantial and expect[ed] to continue to be substantial," and that Wife needs alimony *in futuro* in order to enable her to maintain a standard of living close to that which she enjoyed during the marriage.

We find that the trial court did not abuse its discretion in awarding alimony *in futuro* to Wife under the facts of this case.  According to Husband's own account, in 2006, he earned approximately $23,421 per month.  This amount includes his $5,788 net monthly salary, $6,000 in rent from his law firm for the Beale Street property,[4] and $11,633 in draws from his firm in the first eleven months of 2006.  This amount does not include any distributions from the $46,000 in profit earned by his law firm in 2006 in addition to his draws, which equates to additional income of $3,833 per month.  In contrast, Wife's income is significantly lower than Husband's.  According to Wife's 2005 tax return, she earned an adjusted gross income of $63,845 in that year, which translates to $5,320 per month.  Since 2005, however, Wife has had to rent her office space for her business, which increases her monthly expenses.  Wife also testified that she anticipates a loss of business due to State budgeting issues.  Given these considerations, we cannot say that the trial court erred in crediting Wife's claimed income for 2006 of $3,682 per month.  The evidence demonstrates that the maximum income earned by Wife was her 2005 income of $5,320 per month.  Thus, while Wife's income may be "reasonably good," it is far below that of Husband and would not support a standard of living reasonably close to that which the parties enjoyed during their long marriage.

---

[4]Though Husband's Rule 14(C) affidavit showed that he received only half of this rent, the testimony at trial showed clearly that Husband received the total amount.  Husband asserts that the $6,000 should not be included in his monthly income, because he uses this money to pay the mortgage and property taxes on the property.  While we acknowledge that the rent and expenses appear to be a "wash," the mortgage payments build equity in the property for Husband.  Thus, we feel that it is legitimate to consider the $6,000 per month rent payments to be income to Husband, and to consider the nearly equal monthly mortgage expense to be an investment in real estate for him.

We reject Husband's contention that Wife cannot, as a matter of law, be considered to be economically disadvantaged based on her ability to earn significant, reliable income. The facts in this case are comparable to those presented in *Goodman v. Goodman*, No. M2004-02781-COA-R3-CV, 2006 WL 47359 (Tenn. Ct. App. Jan. 9, 2006). In *Goodman,* the parties were granted a divorce after a 26-year marriage based on stipulated grounds of the husband's adultery. At the time of the divorce, the husband was a physician earning approximately $300,000 per year, and the wife was studying to be a registered nurse with the potential to earn approximately $40,000 per year. The parties agreed to an even division of marital assets, with each party receiving about $1.4 million in marital property. In addition to child support, the trial court awarded the wife alimony *in futuro* of $4,000 per month, until the wife reached age sixty-five, died, or remarried. *Goodman*, 2006 WL 47359, at *1. On appeal, the husband argued that the trial court overly focused on equalizing the parties' future incomes to enable the wife to enjoy the standard of living she enjoyed during the marriage, and that it erred in awarding alimony *in futuro* that the wife did not need. The appellate court disagreed:

> Specifically, the record explicitly shows that the court considered the relative earning capacities of each party; the obligations, needs and financial resources of each party; the relative educational level and training of each party; the duration of the marriage; the provisions made with regard to marital property; the marital standard of living; the contributions of Wife to the marriage and to Husband's increased earning power; and the relative fault of Husband in causing the divorce.

*Id.* at *7. Thus, because the trial court properly considered and applied the relevant statutory factors, it did not abuse its discretion in awarding the wife alimony *in futuro*.

In reaching this conclusion, the appellate court in *Goodman* relied on *Bratton v. Bratton*, 136 S.W.3d 595 (Tenn. 2004). In *Bratton*, the parties were divorced after an eighteen-year marriage. The husband earned about $550,000 per year, and the wife was a financially unsuccessful real estate agent who chose to forego her career in order to be a homemaker and caretaker for the parties' two children. *Bratton*, 136 S.W.3d at 598. The trial court awarded the wife alimony *in futuro* of $10,500 per month until she died or remarried. On appeal, the husband argued that the alimony *in futuro* award was inappropriate because it was based primarily on the parties' standard of living during the marriage and not on the other relevant factors.[5] In affirming the alimony award, the Supreme Court explained that the parties' standard of living is one of several relevant factors that must be considered in making an alimony award. *Id.* at 604 (citing *Robertson v. Robertson*, 76 S.W.3d 337, 340 (Tenn. 2002)). The Court noted that, although the legislature has expressed a preference for rehabilitative alimony, "trial courts should not refrain from awarding long-term support when appropriate under the enumerated statutory factors." *Id.* at 605. The Court noted the

---

[5]The parties had entered into a post-nuptial agreement, which the trial court held to be invalid. On appeal, the husband challenged the trial court's refusal to enforce the post-nuptial agreement, but the appellate courts affirmed the trial court's decision. A significant portion of the Supreme Court's opinion centered on the enforceability of the post-nuptial agreement. *Bratton*, 136 S.W.3d at 599-604.

husband's successful career and substantial income, the husband's fault for the demise of the marriage, the husband's expenditure of considerable monies on his paramour, the fact that the wife had foregone her career in order to care for her family, and the fact that the wife could not be rehabilitated to the standard of living which the parties had enjoyed during the marriage. Because the trial court had expressly considered all of these factors, the appellate court in *Bratton* upheld the award of alimony. *See also Nesbitt v. Nesbitt*, No. M2007-00176-COA-R3-CV, 2008 WL 314631 (Tenn. Ct. App. Feb. 4, 2008) (upholding periodic alimony when wife had modest earnings, but alimony will assist her to maintaining pre-divorce standard of living).

In this case, the record and the trial court's final order show clearly that the trial court considered all of the relevant factors in making its award of alimony *in futuro* to Wife. It considered the relative earning capacities of the parties, the obligations, needs, and financial resources of the parties, the relative educational training of each party, the duration of the marriage, the division of marital property, and the relative fault of Husband in causing the divorce. "A trial court has wide discretion in determining whether an award of alimony should be rehabilitative or *in futuro*, as well as wide discretion in the amount of alimony awarded." *Bratton*, 136 S.W.3d at 605.

In the context of the alimony award, Husband contends that the trial court was inappropriately prejudiced against him and intended to punish him for his fault in the failure of the marriage. To support this assertion, Husband points to comments made by the trial judge during the trial, alluding to appellate decisions that purportedly indicated that punishment of a spouse who was at fault for the divorce was appropriate.[6] In addition, at the conclusion of Wife's testimony, the trial

---

[6]    THE COURT: Case called Brown v. Brown. I got – I didn't get reversed on it, but my opinion got changed quite a bit. It's been four or five years ago. A woman got about three quarters of a million dollars in a settlement free and clear.

MR. SPENCE: Yes, sir.

THE COURT: She had a masters degree in teaching. I thought she didn't need rehabilitative alimony. My decision, I thought, gave her enough that she – and her being a master degree teacher and able to earn a living, so on and so forth. Well, I reversed on that, and we hear this phrase that – that fault is not considered in the division of property and so forth.

MR. SPENCE: Yes, Your Honor.

THE COURT: Better read Brown. They said that since he broke up the marriage, he found another woman – he's kind of like counselor back here. He – and it was set, I don't know, 500 dollars a month or so for the next – forever I guess. I've forgot what it read now, but they – they used the Court of appeals. They entered the fact that it was a happy home, and he took off after someone else, and he was the one that cause it. So, that's where – and what's so strange about it, they didn't even call it alimony. I've forgot now what he even called it. It was division of property. I guess it was punishment.

(continued...)

judge questioned her regarding her certain matters, such as, "How were you affected when you found out that he had another woman?"; How did that affect you by just hearing him being in Chicago and Los Angeles and all that [sic] places?"; "I saw you looking at him a while ago. You still love him, don't you?" Husband acknowledges that he did not object to the trial judge's questions and did not move for the trial judge to recuse himself. Rather, on appeal, he argues that the trial court committed clear error, requiring reversal of its decision.

It is true that litigants are entitled to the "cold neutrality of an impartial court" and have a right to have their cases heard by fair and impartial judges. ***Kinard v. Kinard***, 986 S.W.2d 220, 227 (Tenn. Ct. App. 1998) (quoting ***Leighton v. Henderson***, 414 S.W.2d 419, 421 (Tenn. 1967)). However, "[b]ias and prejudice are only improper when they are personal. A feeling of ill will or, conversely, favoritism toward one of the parties to a suit are what constitute disqualifying bias or prejudice." ***Caudill v. Foley***, 21 S.W.3d 203, 215 (Tenn. Ct. App. 1999) (quoting *Jeffrey M. Shaman, et al.*, Judicial Conduct and Ethics § 4.04, at 101-02 (2d ed. 1995) (footnotes omitted)). We have reviewed the entire transcript of the proceedings. The trial judge's comments on the alleged case were not improper, and in fact Husband's fault for the demise of the marriage could be taken into account in determining alimony. The trial judge's questions may indicate some sympathy toward Wife in the reaction to the evidence, but do not indicate that the trial court's decisions were motivated by a personal feeling of ill will toward Husband or favoritism toward Wife.

Husband also argues that the trial court abused its discretion in awarding Wife $51,030 in attorney's fees. First, he argues that Wife's attorney's fee obligations were considered in the trial court's distribution of marital property, because Wife testified that a significant portion of her fees were paid through her credit cards. He essentially argues that Wife was entitled to "double dip," because she was assessed over $78,000 in credit card balances as her portion of marital debt, while at the same time she was awarded her attorney's fees at the conclusion of the trial. Second, he claims that Wife had no need for an award of attorney's fees, because she was awarded more than adequate liquid assets from which to pay her own attorney's fees. Thus, he argues, the award of attorney's fees in this case was an abuse of discretion because it created an inequitable, unfair, and unjust outcome.

An award of attorney's fees in a divorce case is in essence an award of alimony *in solido*. ***See Herrera v. Herrera***, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). Tennessee Code Annotated § 36-5-121(d)(5) provides that "[a]limony *in solido* may be awarded in lieu of or in addition to any other alimony award, in order to provide support, including attorney fees, where appropriate." As indicated above, a trial court's alimony decisions are reviewed under an abuse of discretion standard. ***See also Aaron v. Aaron***, 909 S.W.2d 408, 411 (Tenn. 1995) (stating that an award of attorney's fees is reviewed for an abuse of discretion). As with any award of alimony, a trial court should consider the relevant factors set forth in Tennessee Code Annotated. § 36-5-121(i), *supra*, with the most

[6](...continued)
        MR. SPENCE: Well, I haven't read Brown, but I will.

important factors being the need of the economically disadvantaged spouse and the obligor spouse's ability to pay. **Riggs v. Riggs**, 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007). As this Court explained in **Koja v. Koja**:

> [Awards of attorneys' fees as alimony *in solido*] are appropriate . . . only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses . . . or would be required to deplete his or her resources in order to pay these expenses. Where one party has been awarded additional funds for maintenance and support and such funds are intended to provide the party with a source of future income, the party need not be required to pay legal expenses by using assets that will provide for future income.

**Koja v. Koja**, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000) (internal citations omitted).

In light of the trial court's property division, its alimony award, the allocation to Wife of her credit card debt, which included a substantial part of her attorney's fees, and the trial court's implicit allocation to Husband of substantial tax liabilities, we are satisfied that Wife has sufficient resources with which to pay her outstanding attorney's fees. Accordingly, we reverse the trial court's award of attorney's fees to Wife.[7]

Wife has requested that she be awarded her attorney's fees in defending this appeal. An award of appellate attorney's fees is a matter within this Court's sound discretion. **Archer v. Archer**, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). When considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case. **Darvarmanesh v. Gharacholou**, No. 2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005). Considering the relevant factors, we decline to award appellate attorney's fees to Wife in this case.

The decision of the trial court is affirmed in part, reversed in part, and modified as set forth above, and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are to be taxed to Appellant Charles Edward Carpenter, Sr., and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[7]This holding makes it unnecessary for us to address Husband's contention that the attorney's fee award in essence permitted Wife to "double dip," because she was allocated her credit card debt.